**LOUISVILLE REFINING COMPANY, Appellant,**

v.

**Dorothy MUDD, Appellee.**

Court of Appeals of Kentucky.

Oct. 7, 1960.

Raymond F. Bossmeyer (Heidenberg & Bossmeyer), John K. Skaggs, Jr. (Skaggs, Hays & Fahey) James E. Fahey, David R. Driscoll, Jr., Louisville, for appellant.

J. W. Jones, Louisville, for appellee.

PALMORE, Judge.

The appellee, Dorothy Mudd, won a verdict and judgment awarding her $1,000 for

diminution of the market value of her home as the result of an alleged permanent nuisance created and maintained by the appellant, Louisville Refining Company (hereinafter called the Company), in the operation of its petroleum refinery. The Company moves for an appeal, contending it was entitled to a directed verdict and judgment as a matter of law. It is further contended that the instructions did not fairly submit the proper issues to the jury.

The dispute involves neighboring properties in the southwest quarter of Louisville. The refinery tract lies along the west side of Southwestern Parkway and extends westwardly to the Ohio River. It is bounded on the north by Chickasaw Park and on the south by the old Ford assembly plant, now owned by a box company. Farther to the south are numerous other industrial plants, including installations of Gulf Oil Company, Ashland Oil Company, Aetna Oil Company, and Standard Oil Company, and what is known as the Fort Southworth Sewage Disposal Plant. The Louisville Refinery Company plant is the northernmost of a concentrated group of industries situated in the proximity of the Ohio River west of Southwestern Parkway. Except for a narrow strip bordering the west side of the parkway the Company's property has been zoned by the City of Louisville for heavy industrial use (that is, any lawful use).

Directly across the parkway, to the east, is the old State Fairgrounds property, which in recent years has been cut up and devoted to various commercial enterprises. This area is zoned for light industrial use, as is the aforementioned narrow strip running along the west border of the parkway.

The Company's refinery tract extends a very short distance, perhaps quarter of a block, farther north than the old Fairgrounds property, making an offset in what would otherwise be a straight east-west line marking the north boundaries of these two industrial areas. The general territory to the north of this line (except for Chicka-saw Park, a cemetery, and certain minor deviations) is zoned for residential use and has been almost completely developed and occupied for that purpose.

Mrs. Mudd's home is located east of the parkway on the south side of Winnrose Way (formerly Fordson Way), which is near the south edge of the residential area and runs an east-west course parallel with and a half block north of the old Fairgrounds tract, ending at the east side of the parkway opposite the above mentioned offset (the offset being the northeast corner of the Company's refinery). It is the first home east of the parkway but is not on the corner, as there is a vacant strip of about a half block, zoned light industrial, along the east side of the parkway at this point, terminating at the south line of Winnrose Way. The house was built in 1950 and bought by Mrs. Mudd in the same year for $6,800. The portion of the refinery plant alleged to be the source of nuisance is 160 feet west of the center of the parkway and 420 feet from Mrs. Mudd's home.

The Company has operated its refinery at the existing site continuously since 1928. Much of its property is occupied by storage facilities. The refinery units are situated on the portion of the property nearest Southwestern Parkway. The original refinery consisted of a "skimming" or "crude" unit and a "thermal" unit. Technicological developments in the industry dictated the addition of a "catalytic cracking" unit in 1952 and a "platformer-unifying" unit in 1957. These various refining plants involve the use of gas furnaces, electrically operated pumps and compressors, and various control valves, operating around the clock and necessarily producing a composite noise variously characterized by the Company's plant engineer as a "humming" sound, by Mrs. Mudd as a metallic grating or roaring noise, and by one of her witnesses as two noises, "a roaring sound and also a clanging, rhythmic sound that is reminiscent of a freight train."

Mrs. Mudd testified that there was noise from the plant before 1957 but that it did not become annoying until that year (when the "platformer-unifying" unit went into operation). She said it made her nervous, interfered with her sleep, and required that she keep the windows closed. She denied hearing any other industrial noises at her home. Though she claimed also that there was a vibration from the refinery, the absence of such a condition was definitely established and it was not submitted to the jury as an element of the alleged nuisance. Two qualified witnesses testified that the presence of the offensive noise reduced the market value of the property by $1,250 and $900, respectively.

Though an attempt was made to question the necessity of placing the "platformer-unifying" unit at its particular location with relation to the parkway, as against setting it farther westward, there was no evidence of probative value to refute the Company's testimony that no other location was feasible and that the unit is essential to the continued existence of the business. It is a complex, substantial, permanent and obviously expensive structure. There also was no evidence of substance to the effect that the noise is not normal or usual to this type of operation or that there is any feasible way to eliminate it. Therefore, the problem is not within that category of cases where a lawful business is so operated as to cause unnecessary annoyance. On the contrary, it is the case of a lawful business properly located and prudently operated but nevertheless giving offense, by way of noise, to the owner of neighboring residential property.

In the whole field of law there is nothing more difficult to capture within the confines of a workable definition than the concept of nuisance, nothing more dependent on the peculiar facts of the given case. Like the legendary and elusive gadfly Tyll Eulenspiegel, it scoffs at the conventionalities of the law.

"Nuisance, which means literally annoyance, may be described as a wrong done to one by disturbing him in the enjoyment of his property or in the exercise of a common right. But the term eludes exact definition because, as has been well said, 'the controlling facts are seldom alike, and each case stands on its own footing' * * *. What amount of annoyance or inconvenience, then, will constitute a nuisance is largely a question of degree; the injury, of course, must be real and substantial and in the case of private nuisance must be such as to interfere materially with ordinary physical comfort or the reasonable use of property." W. H. Lloyd, "Noise as a Nuisance," 83 U. of Pa.L.Rev. 567, 580 (1934).

" 'Nuisance' has remained an isolated island of liability without fault and courts have resorted to 'nuisance' terminology to impose liability when prompted by policy considerations. * * *" Harper & James, "The Law of Torts," Vol. I, p. 69.

The plaintiff's recovery in this case is grounded on the authority of Kentucky-Ohio Gas Co. v. Bowling, 1936, 264 Ky. 470, 95 S.W.2d 1, and Kentucky & West Virginia Power Co. v. Anderson, 1941, 288 Ky. 501, 156 S.W.2d 857. In the Bowling case the right of recovery was recognized (though reversed on erroneous measure of damages) where the plaintiff's home in a thinly populated vicinity 2½ miles from town was subjected to vibration from a power plant and pumping station constructed across the road from the residence. The court said the question of whether a lawful business creates a nuisance depends on the reasonableness vel non of its conduct "in the particular locality and in the manner and under the circumstances of the case." In the Anderson case [288 Ky. 501, 156 S.W.2d 858] a $500 verdict for plaintiff was affirmed where the defendant erected within a distance of 15 feet from the plaintiff's home at the edge of Pikeville an electric sub-station that produced a constant buzzing or humming. In rejecting a con-

tention that the instructions should have submitted the question of whether the noise was "excessive or unreasonable in degree" the court said, "It is no defense that skill and care have been exercised and the most improved methods and appliances employed to prevent such result. * * * The determinating factor when noise alone is the cause of complaint is not its intensity or volume. It is that the noise is of such character as to produce actual physical discomfort and annoyance to a person of ordinary sensibilities, rendering adjacent property less comfortable and valuable. If the noise does that it can well be said to be substantial and unreasonable in degree; and reasonableness is a question of fact dependent upon all the circumstances and conditions."

After having thus indicated that the test of "reasonableness" lies chiefly in the effect produced by the annoyance, notwithstanding the care and prudence exercised by the defendant in the use of its property, the court in United Fuel Gas Co. v. Sawyers, Ky.1953, 259 S.W.2d 466, 467, 38 A.L.R.2d 1261, gave voice to a somewhat different philosophy in expressing itself as follows:

"The question is one of nuisance in the broad sense that the law operates as a restriction upon the right of an owner of property to make use of it as he pleases. * * * Accepting as sufficient the causal connection, there may have been liability under an unqualified adherence to the common law as laid down in Rylands v. Fletcher * * * that one must in all events so use his property as not to injure the legal rights of his neighbor. But present American law departs from the English common law. It exonerates the owner from legal liability if there was a 'reasonable use' of his property. * * * Kentucky law is in accord with the 'American Rule,' that in the absence of negligence there is no liability if there was a legitimate and reasonable use. 'The doing of a lawful thing in a careful and prudent manner cannot be a nuisance' ", citing Louisville & N. R. Co. v.

Commonwealth, 1914, 158 Ky. 773, 166 S.W. 237 (a criminal case).

The natural result of the situation is that we have a plaintiff insisting on the Bowling and Anderson rule and a defendant insisting on the Sawyers rule. In resolving this inconsistency it may serve the purpose of clarity to consider briefly the historical aspect of the law of nuisance.

"The earliest cases proceeded upon the theory that an owner of property was entitled to pure and unadulterated air over his property. As we became more industrial and less pioneering and agricultural, courts were forced to recognize that industry could never develop or even live if exceptions were not made in the original hard and fast rule. The law thus developed that if industrial plants were located in places suitable to their business no action for nuisance would lie unless the interference * * * was substantial and unreasonable or unless the defendant was causing more interference than was necessary in the proper conduct of his business. This latter alternative is commonly classed as negligence." Patterson v. Peabody Coal Co., 1954, 3 Ill.App.2d 311, 122 N.E.2d 48, 51.

The trend away from strict liability reaches its zenith in those cases applying the principle stated in Louisville & N. R. Co. v. Commonwealth, 1914, 158 Ky. 773, 166 S.W. 237, rejected in the Anderson case, and restated (perhaps unintentionally) in the Sawyers case. It is expressed in Jedneak v. Minneapolis General Electric Co., 1942, 212 Minn. 226, 4 N.W.2d 326, 328–329, as follows:

"What would be a substantial interference with the enjoyment of life in a residential area might very well be perfectly normal and inescapable in an industrial section. The problem becomes one of measuring what is normal and what is abnormal interference with life in an industrial area. * * * Though negligence upon part of defendant need not be proved, whether defendant was doing as much as reasonably

was possible in the way of careful operation becomes the measure of whether there has been substantial interference with plaintiff's enjoyment of life."

This viewpoint, diametrically opposed the rule stated so vigorously in the Anderson case, tests the matter of reasonableness entirely by the conduct of the defendant company. It is particularly adaptable to cases where the defendant's activity conforms to or is specifically permitted by applicable zoning laws, and in 1935 California enacted a statute, West's Ann.Code of Civil Procedure, § 731a, prohibiting injunctions against the reasonable and necessary operation in an industrial or commercial zone of any use "expressly permitted" therein by the zoning laws of a city or county. "The major significance of this legislation is that it prevents a commercial use from constituting a private nuisance whenever it is conducted in its proper zone without unnecessary and injurious methods of operation. The fact that damage may be caused by this operation is irrelevant. It has been seen that although there is some authority at common law for the position taken by this statute, the general common law rule holds that the fact that a business is operated as carefully as possible does not prevent its injunction as a nuisance if sufficient interference with the use and enjoyment of land can be shown. Thus, whereas the three principal factors at common law are the extent of the injury, the locality of the business, and its manner of operation, once the locality is established as a commercial zone the California legislation looks only to the manner of operation of the business." Note, "The Effect of Zoning Ordinances on the Law of Nuisance," 54 Mich.L.Rev. 266, 271–273 (1955).

The trouble with this concept is that in completely disregarding the severity of damage to the complainant the pendulum swings too far. Though it might be a fairly easy rule to apply, we do not think it gives sufficient consideration to the rights of habitation. Especially is this true where the complaining party does not live in the industrial zone itself, but on its fringe. "The situation most difficult of compromise is that where the locality * * * embraces the marginal line between commercial uses and residential areas, and the lands of the commercial user and residence owner are adjacent and devoted to respectively consistent uses." Note, "Noise Nuisances: Commercial Enterprises v. Owners of Residential Property," 7 Vanderbilt L. Rev. 696, 697–698 (1954).

The trend toward a more balanced viewpoint has been well expressed as follows: "On the whole, and without any change in the language of the courts, there can be detected a tendency to require from industry an increased regard for the comfort of the surrounding community. Improved building construction, more skillful engineering, make this possible without imposing too heavy a burden on essential activities. * * * In the nuisance cases generally, the fatalism that once found discomfort the ordinary mortal lot, is giving place to an insistence that engineering skills shall be applied to reduce to the utmost the annoyances incidental to modern life. Legal standards of what should be regarded as ordinary and reasonable comfort improve, as the standard of living rises, and life becomes more civilized." W. H. Lloyd, "Noise as a Nuisance," 82 U. of Pa.L.Rev. 567, 573, 580–581 (1934).

■ Without fully subscribing to the serpentine approach of the Restatement of the Law of Torts (Ch. 40, paragraphs 822–831), we accept the proposition that the existence of a nuisance must be ascertained on the basis of two broad factors, neither of which may in any case be the sole test to the exclusion of the other: (1) the reasonableness of the defendant's use of his property, and (2) the gravity of harm to the complainant. Both are to be considered in the light of all the circumstances of the case, including the lawful nature and location of the defendant's business, the manner of its operation, and such importance to

the community as it may have; the kind, volume, time and duration of the particular annoyance; the respective situations of the parties; and the character (including applicable zoning) of the locality. The extreme limits are therefore, on the one hand, the reasonable use causing unreasonable damage and, on the other hand, the unreasonable (or negligent) use causing damage that is more unnecessary than severe.

■ In the suit for damages alone the application of these broad considerations to the facts of the case is for the jury, subject to the general principle that there must be sufficient evidence of an over-all inequity to the complainant in order to justify its submission. That the minimum sufficiency of the evidence is a difficult line to draw may be conceded, and in that respect each case must be judged on its own facts, recognizing that no matter what else might be said, in the final analysis the question of what constitutes a private nuisance is a matter of degree anyway.

■■ Applying the foregoing principles to the case at hand, we find that the evidence was sufficient to submit the cause to the jury and the motion for directed verdict was properly overruled. However, the instructions given by the trial court necessarily assumed as a matter of law either that the use of the refinery property was unreasonable or that, if reasonable, recovery was nevertheless allowable if the annoyance to the complainant was sufficient to offend a person of ordinary sensibilities. In short, the jury was not permitted to weigh the relative circumstances of the parties, and in our opinion the Company was thereby deprived of a fair trial.

■ In the retrial of the matter, if the evidence is substantially the same, the court should instruct the jury to the effect that if the noises from the refinery units of the Company cause unreasonable and substantial annoyance to the plaintiff, and are such as would cause substantial annoyance to a person of ordinary health and normal sensitivities occupying her home, and if thereby the market value of her property (as defined in the instruction on damages) has been materially reduced, the law is in her favor, but (and this may be placed in a separate instruction) that in determining whether such annoyance (if any) is unreasonable the jury shall take into consideration all of the circumstances of the case as shown by the evidence, including the lawful nature and location of the Company's business; the manner of its operation; the importance of its business and its influence on the growth and prosperity of the community [cf. Reid's Branson on Instructions to Juries (3d ed.), § 3996]; the kind, volume, time and duration of the noise; the respective situations of the parties; and the character and development of the neighborhood or locality in which their properties are situated.

■ One further question raised by the Company requires disposition. It will be recalled that there was noise from the older units before the "platformer-unifying" unit was put into operation in 1957. It is suggested that as to them the 5-year statute of limitations had run and that recovery may be had only for that particular segment of the noise emanating from the 1957 unit. The statute however, does not run with the noise; it runs against the cause of action. There was no cause of action until the sum total volume became an annoyance, which plaintiff says was in 1957. Her cause of action is directed against the composite total, and it arose in 1957.

The inconsistent language of the Anderson and Sawyers cases may be considered as modified to accord with this opinion.

The motion for appeal is sustained and the cause reversed with directions that a new trial be granted.