**LOUISVILLE AND JEFFERSON COUNTY AIR BOARD, Appellant,**

v.

**James L. PORTER et al., Appellees.**

Court of Appeals of Kentucky.

Dec. 17, 1965.

James W. Stites, Stites, Peabody & Helm, T. Kennedy Helm, Jr., Stites, Peabody & Helm, Louisville, for appellant.

R. D. McAfee, Richard D. Remmers, Louisville, for appellees.

PALMORE, Judge.

Appellant, Louisville and Jefferson County Air Board (hereinafter called the Air Board), a suable public corporation created under KRS 183.132, owns and operates Standiford Field, principal airport in what might be termed the Greater Louisville area. Appellees, the Porters, own and reside in a house on Tuberose Avenue about half way between the airport property on the west and Kentucky Turnpike on the east. In this action against the Air Board the Porters recovered a $2,250 verdict and judgment for diminution in market value of their home resulting from annoyances of a permanent or continuing character attributable to the operation of the airport. Because of the importance of the questions involved, this court sustained the Air Board's motion for an appeal, KRS 21.080, RCA 1.180, and has had the benefit of oral argument supplementing the briefs by counsel for the respective parties.

It is the position of the Air Board that it was entitled to a directed verdict at the conclusion of the testimony, first because no actionable wrong was proved, and secondly because, if there was a cause of action, it was barred by the 5-year statute of limitations, KRS 413.120. In view of our conclusion on the first of these points it will not be necessary to discuss the question of limitations.

The salient events culminating in the situation of which the Porters complain developed as follows:

1. Standiford Field was designed and planned as an "industrial airport" (that is, "having facilities for aeronautically ori-ented industry"), and purchases of land for it began in 1939.

2. The federal government (hereinafter called the government) took the field over in late 1941 or 1942 and returned it to the Air Board in 1947. In the interim the government completed construction of the airport according to the original plans and in addition built two large installations for industrial purposes, one of which was the Vultee Modification Center on the east side of the field and the other was the Curtiss-Wright plant on the west side. During World War II the Curtiss-Wright plant was used for the manufacture of C-47 cargo aircraft. It is now occupied by the International Harvester Company and is not a part of the airport. During World War II the Vultee Modification Center was used for the modification of B-24 Liberator bombers. It is still a part of the airport facilities and is called the "hangar area." It is leased in part by the Bremner Biscuit Company and in part by some smaller commercial tenants.

3. A master plan of zoning for Louisville and Jefferson County was formulated in 1943. Cf. KRS 100.044. With regard to Standiford Field it did no more than show the boundaries, and did not restrict the property to any particular use or purposes. Zoning regulations adopted pursuant to the master plan include provisions for a "Special Use" permit, and it was the opinion of a representative of the Planning and Zoning Commission, testifying for the Porters, that in the absence of such special permission (which the Air Board has never sought and does not have) the Air Board may not use the land "for anything not related to an air field." But in view of the cold fact that Standiford Field appears to have been left unzoned from the beginning, it seems to us that no special permission is necessary in order for it to be used for any purpose not prohibited by law.

4. The first landing of a jet airplane at Standiford Field took place in 1946, dur-

ing the period of government control. Commercial scheduled airline service began there in November of 1947, having theretofore been concentrated at Bowman Field, a smaller airport at the eastern edge of Louisville.

5. Four-engine aircraft used the airport extensively during the war, and commercial 4-engine planes began using it regularly in early 1948.

6. Tuberose Avenue was developed for residential purposes in 1949 and 1950. The Porters bought their lot in December of 1949 and built a home on it in 1950. They have lived there ever since. At the time of its development Tuberose Avenue ran eastwardly from old Grade Lane, a north-south road bordering the east side of the air field, and led into another residential subdivision to the east. Despite the presence of the airport, the Porters depict the area at the time as a quiet, peaceful neighborhood. Since then the Kentucky Turnpike, which also runs north and south, has been constructed some 1200 feet east of Grade Lane, cutting Tuberose Avenue off from the residential area to the east, and Grade Lane has been relocated to run along the west border of the turnpike. Hence the portion of Tuberose Avenue with which we are concerned now extends from new Grade Lane on the east to the airfield on the west, old Grade Lane having been closed and most of the houses and trees on it having been removed. The Porter property is approximately in the middle, or about 600 feet from each end of Tuberose Avenue.

7. In 1956 the Air Board leased to the government, for use by the Air National Guard (hereinafter called the Guard), a 35-acre portion of the air field located immediately across old Grade Lane from the west end of Tuberose Avenue. Prior to that time the Guard unit had been located in the hangar area formerly used by Vultee and in which the Bremner Biscuit Company now manufactures its products.

The Guard began using jet planes "in a very limited degree" during the summer of 1956 and received one or two additional of such planes per month until it reached a full complement of 16, which was the number being maintained and operated at the time this litigation commenced. In the Guard area adjacent to old Grade Lane the government has constructed hangars, office facilities and other buildings necessary for the storage and maintenance of the Guard aircraft. These structures are situated between the west end of Tuberose Avenue and the north-south landing strip of Standiford Field, which is the only runway used by jet planes.

8. As heretofore mentioned, the first landing of a jet plane at Standiford Field took place in 1946, and the Guard began using them in 1956. Meanwhile, commercial air service was provided by conventional aircraft until 1959, when the so-called "turbo-prop," typified by the Electra, came into regular use. The commercial air lines began to operate "pure jet" planes in March of 1960, but they were not regularly scheduled until March of 1962. There are now four commercial jet flights daily, the first arriving at 11:00 A.M. and the last departing at 7:23 P.M.

9. In 1962 the Air Board acquired by purchase a 30-foot right-of-way for a railroad spur track which comes up toward Standiford Field from the south, turns eastward and crosses old Grade Lane, then makes an 11-degree curve northward bordering the west line of new Grade Lane, crosses Tuberose Avenue at its intersection with new Grade Lane, continues northward along the west line of new Grade Lane for a distance of some 2,000 feet, and then makes a 16-degree curve westward and leads into the air field, terminating in the hangar area where the biscuit company is located. Pursuant to an easement granted it by the Air Board the L. & N. Railroad Company then proceeded to construct and now uses an indus-

trial spur track on this right-of-way. Thus far the biscuit company is the only customer served by the spur track, but the Air Board hopes in the future to locate other industrial tenants in the same sector of its property. The Porter home is 600 feet from the 11-degree curve and 2,000 feet from the 16-degree curve. As of the time this suit was filed the Air Board evidently had neglected to secure a re-zoning of the property embracing that portion of the spur right-of-way which lies outside the air field. To that extent the maintenance of the track appears to be in technical violation of the zoning regulations.

10. In January of 1963, when this suit was filed, the Porters and their neighbors say they were suffering great annoyance from the noise and vibrations of aircraft in flight, engines being tested or "run-up" on the ground by the Guard, and trains using the spur track. There was always some amount of annoyance, especially at times of unusually heavy air traffic, as on Derby Day, but according to the Porters it did not reach objectionable proportions until the last three or four years (the statute of limitations being five).

It is unnecessary to describe the particular annoyances in great detail. Of the three sources, planes in the air, planes on the ground, and switching operations on the spur track, "revving-up" the Guard's jet planes on the ground is the most substantial. The Guard is required to be 75% operational at all times, which means that 12 of its 16 jet planes must be ready to fly in the event of an emergent military call. The running of motors while planes are on the ground is necessary for the purpose of testing and adjustment, particularly after the engines have been taken off for repairs or overhaul and then re-installed on the aircraft. According to records kept by the Guard, this operation is conducted in the daytime and during an average time of 9½ hours per month. It is usually done at a particular point on the airfield next to the north-south runway, 4,000 feet and on

the other side of the Guard's building complex from the Porter property.

The newest disturbance is, of course, the switching of railroad cars over the spur track. Besides the ringing of bells, sounding of horns, and normal engine noise, the railroad equipment causes a shrill "screeching" as it passes through the two curves we have heretofore mentioned. A representative of the railroad company testified that the degree of curvature accords with standard railroad construction. The normal time at which cars are spotted into the airfield is about 6:00 P.M., and most-times it is accomplished between 5:00 P.M. and 9:00 P.M. Statistics kept by the railroad company indicate that over a 6-month period there were 13 days on which the switching was done after 9:00 P.M., 6 days on which there were more than one such operation, and 38 days on which there were none.

As we have said, there are four commercial jet flights daily. The record does not disclose the number of military or other special jet flights. The total number of commercial flights into the airport has decreased from a daily average of 86 in 1959 to 59 in 1963. At the same time, however, the planes have become larger and some are more noisy.

Standiford Field has two principal runways for take-off and landing, one running generally north-south and the other east-west. None of the approach areas or holding patterns extend over the Porter property, and there is no complaint of direct overflights. All jet traffic uses the north-south runway, which is 4,000 feet west of the Porter property.

The Air Board does not operate any aircraft or control the flight of planes using the airport, nor does it have any control over the operation of trains on the spur track. It was selected as the proper defendant on the theory expressed in Griggs v. County of Allegheny, Pennsylvania, 369 U.S. 84, 85, 7 L.Ed.2d 585, 82 S.Ct. 531

(1962), that the owner of an airport is responsible if the use of its facilities effects a taking of private property within the purview of the 5th and 14th Amendments of the U. S. Constitution. For purposes of the argument it may be assumed that under a constitutional provision against injuries to as well as the physical taking of private property for public use, cf. Const. § 242, the same principle would apply by analogy.

The Air Board concedes that Const. § 242 makes a governmental agency which has the power to sue and be sued liable for damage to property caused by its non-negligent acts. See "Claims against the State of Kentucky – Reverse Eminent Domain," by Oberst and Lewis, 42 Ky.L.J. 163 (Jan. 1954), for an entirely adequate background on the subject.

■ Certainly, however, a governmental agency would not have a greater liability than a private individual, in the sense that a cause of action would lie against it where none would lie against the individual. Therefore, since in this case there is no claim of negligence or of direct trespass, plaintiffs must rely on the principles of nuisance, and under the theory of nuisance this court has adopted it should be clearly recognized that an activity which would constitute a nuisance if conducted for private gain may not necessarily be a nuisance when it is conducted for an important public purpose.

The trial court instructed the jury to find for plaintiffs if the noises and vibrations resulting from the operation of the airport, including the activities of its tenants and the use of the railroad spur track, diminished the use and peaceful enjoyment of their property and thereby reduced its market value. In substance, this was a ruling that the noise and vibrations were a nuisance as a matter of law if they resulted in damage to the value of plaintiffs' property.

It was held in Louisville Refining Company v. Mudd, Ky., 339 S.W.2d 181, 186 (1960), "that the existence of a nuisance must be ascertained on the basis of two broad factors, neither of which may in any case be the sole test to the exclusion of the other: (1) the reasonableness of the defendant's use of his property, and (2) the gravity of harm to the complainant. Both are to be considered in the light of all the circumstances of the case, including the lawful nature and location of the defendant's business, the manner of its operations, and such *importance to the community* as it may have; the kind, volume, time and duration of the particular annoyance; the respective situations of the parties; and the character (including applicable zoning) of the locality. The extreme limits are therefore, on the one hand, the reasonable use causing unreasonable damage and, on the other hand, the unreasonable (or negligent) use causing damage that is more unnecessary than severe. In the suit for damages alone the application of these broad considerations to the facts of the case is for the jury, subject to the general principle that *there must be sufficient evidence of an overall inequity to the complainant in order to justify its submission.*" (Emphasis added.)

In the proper and reasonable conduct of their business, agencies of public transportation always have enjoyed a certain indulgence at the hands of the law, not for any subtle or unworthy reason but because of their nature and direct importance to progress, prosperity and public welfare. For example, a doctrine was developed in the early days of the railroad industry "that a railroad duly chartered and authorized to operate by the state legislature was not responsible for consequential annoyances to adjoining landowners so long as the disturbance was a necessary and incidental concomitant of proper operation. This doctrine was premised on the assumption that railroad operation seriously affected so many landowners that to allow tort actions against railroads for these disturbances would cripple the development of an essential industry." Note, "Airplane Noise: Problem in Tort Law and Federalism," 74 Harv.L.Rev. 1581, 1595

(1961). The view of this court was expressed as follows:

"The operation of a railroad train, and of switchyards, in connection therewith, is a lawful occupation, and the carrying on of its business, and the necessary incidents thereto, when done in a careful and reasonable way, and without unnecessary noises cannot be a nuisance.

"It is a matter of common knowledge that the emission of smoke from engines, and ringing of bells, the blowing of whistles, and the grinding of wheels are necessary incidents to the operation of railroad trains. A railroad cannot be operated without burning coal, and the coal cannot be burned without making smoke; the ringing of bells and the blowing of whistles are not only necessary incidents to the operation of railroad trains, but the giving of signals in that way is actually required by law in many instances; and it is perfectly apparent that the grinding of wheels cannot be avoided in the operation of trains. It will be observed that there is no allegation in the indictment that the things complained of were unnecessarily done, or that it was not necessary for the railroad company in the operation of its trains to blow the whistles, to ring the bells, or to cause the emission of large volumes of smoke. The necessities of commerce demand the operation of railroads, and railroads cannot be operated without these necessary incidents, and there can be no nuisance in the operation of a railroad or of its switchyards, unless the noises created thereby are unnecessary in its operation."

"The doing of a lawful thing in a careful and prudent manner cannot be a nuisance; but the doing of a lawful thing in a reckless, careless, or negligent way may be a nuisance." Louisville & N. R. Co. v. Commonweath, 158 Ky. 773, 166 S.W. 237, 238 (1914).

The opinion from which the foregoing quotation was taken dealt with the question of public nuisance, but the same viewpoint governed in cases of alleged private nuisance. See Cincinnati, N. O. & T. P. Ry. Co. v. McQuaid, 172 Ky. 495, 496, 189 S.W. 423 (1916); Kilcoyn v. Chicago, St. L. & N. O. R. Co., 141 Ky. 237, 132 S.W. 438 (1910). Somewhat paradoxically, however, this policy did not carry over to actions against governmental units under Const. § 242 for injuries to property resulting from change in grade of established streets. See, for example, City of Ashland v. Queen, 254 Ky. 329, 71 S.W.2d 650 (1934), in which a city and county were held liable to abutting property owners for damages occasioned by the non-negligent construction of a highway viaduct.

█ We have departed from the notion that the non-negligent operation of a lawful business cannot be a nuisance. Lynn Mining Co. v. Kelly, Ky., 394 S.W.2d 755 (1965). Though it seems never to have been consistently applied to differing fact situations, it has been a favorite crutch when convenient. This particular court's ambivalence in that respect was discussed at some length in Louisville Refining Company v. Mudd, Ky., 339 S.W.2d 181 (1960), in which previous opinions including United Fuel Gas Co. v. Sawyers, Ky., 259 S.W.2d 466, 38 A.L.R.2d 1261 (1953), were modified to accord with the conclusions reached in that case. See also Associated Contr. Stone Co. v. Pewee Val. San. & Hosp., Ky., 376 S.W.2d 316, 318 (1964). Opinions holding negligence to be a requisite of recovery in blasting cases were to that extent overruled in Lynn Mining Co. v. Kelly, Ky., 394 S.W.2d 755, 758 (1965). Meanwhile, perhaps by inadvertence, the United Fuel Gas Co. case popped up again in Commonwealth ex rel. Dept. of Fish and Wildlife Resources v. Mayer, Ky., 357 S.W.2d 879, 881 (1962), as authority for the proposition that in the absence of negligence there is no liability for a legitimate and reasonable use of land. It was not, however, necessary to the conclusion reached in the latter case,

which would have been the same under the principles of Louisville Refining Company v. Mudd, supra. To the extent the Commonweath ex rel. Dept. of Fish and Wildlife Resources v. Mayer opinion suggests there can be no liability without negligence, it is necessarily overruled by Lynn Mining Co. v. Kelly, Ky., 394 S.W.2d 755 (1965).

There are two other opinions that bear explanation in this respect. In Kentucky West Virginia Gas Company v. Matny, Ky., 279 S.W.2d 805 (1955), and Hawkins v. Wallace, Ky., 384 S.W.2d 507 (1964), and probably other decisions involving the statutes of limitation in nuisance cases, significance was ascribed to the fact that the structures of which complaint was made had not been negligently erected or operated. Neither case implies, however, that negligence was a necessary element of the cause of action. To the contrary, the point was that without negligence the nuisance, if any, was bound to be permanent rather than temporary, and thus subject to the 5-year statute of limitations.

But even though non-negligence in the operation of a lawful business is not always conclusive, it is nevertheless an important factor in determining whether a nuisance exists. As we view the evidence in this case it seems to us that the operations of which the Porters complain are reasonable and for the most part necessary and unavoidable. Perhaps the Air Board could have done without the factories and the spur track service, but obviously the air field was planned with this type of development in mind. It was established at a time when the area was sparsely populated, and its use during World War II provided fair warning of what it would surely become in the future. We come thus to the other side of the coin. The consequent effect upon living conditions in the area were clearly expectable, and hence avoidable by those at least who were not already there, including the Porters. It is fundamental that a buyer of property assumes the risk of changing community conditions. Sometimes the value of his property is enhanced, and he does not have to pay for the enhancement. Sometimes it declines, and he has no recourse. These facts of life are not subject to an exception simply because the source of the transition can be identified and is suable. If they were, a municipality would be accountable for the economic effects of zoning classifications. Whereas the necessities of the situation on the part of the Air Board are an important consideration on the one hand, so also is the choice of the Porters to live in this particular neighborhood with full knowledge that the airport was already there. They could not reasonably have expected it to stagnate amid the inevitable onrush of progress.

While the gravity of harm suffered by the Porters is substantial in the sense that $2,250 is not a trifle, it bears mention that the intermittent annoyance to which they are subjected is not materially different from that which is endured by the dwellers near every sizeable airport. Their property has not been physically damaged or rendered uninhabitable. Indeed, in 1961 they improved the attic with the intention of ultimately converting it into two bedrooms. It is doubtful that they experience any greater interference in the use and enjoyment of their home than do those persons who reside along heavily-traveled streets, highways and railroads. The inconveniences are ordinary and the damage not unreasonable in view of the source and circumstances.

There are recent well-considered opinions from other jurisdictions in which recovery under conditions similar to those in this case has received judicial recognition. Martin v. Port of Seattle, 64 Wash.2d 309, 391 P.2d 540 (1964); City of Jacksonville v. Schumann, Fla.App., 167 So.2d 95 (1964); City of Charlotte v. Spratt, 263 N.C. 656, 140 S. E.2d 341 (1965); and Thornburg v. Port of Portland, 233 Or. 178, 376 P.2d 100 (1962). See also the dissenting opinion of Chief Judge Murrah in Batten v. United States, (10 Cir. 1962), 306 F.2d 580. But this court, under the facts of this case, is differently persuaded. It is our conclusion that there

was not sufficient indication of an over-all inequity to the complainants to justify submission of the question to the jury. We hold that the Air Board's motion for a directed verdict at the conclusion of the evidence and later motion for a judgment n.o.v. should have been sustained.

The cause is reversed with directions that a judgment be entered dismissing the claim.