**CITY OF LOUISVILLE, a Municipal Corporation, Appellant,**

v.

**William R. MUNRO and Sara J. Munro, Appellees.**

Court of Appeals of Kentucky.

Nov. 19, 1971.

Rehearing Denied Feb. 18, 1972.

**480**

James E. Thornberry, Director of Law, Bernard S. Goldstein, Robert E. Sims, Asst. Directors of Law, Louisville, for appellant.

Henry J. Burt, Jr., Louisville, for appellees.

CULLEN, Commissioner.

William R. Munro and wife, who own a residence adjoining the Louisville Zoological Gardens, obtained a $7,500 judgment, on a jury verdict, against the City of Louisville, as damages for depreciation of the value of their property from the establishment of the city zoo next door to them. The city appeals, asserting various grounds of error, the first of which is that the trial court erred in not sustaining the city's motions for a directed verdict and for judgment notwithstanding the verdict.

The Munros built their residence in 1961. The selection of the tract of land adjoining the Munros' property as the site for the zoo was made by the city in 1964. A ground-breaking ceremony was held in January 1965 and work on clearing the land began a few months later. The Munros brought the instant action for damages in May 1965, before any construction had been commenced. The action was not tried, however, until early in January 1969, following the opening of the zoo which occurred in May 1968.

As evidenced by the fact that the action was brought before the zoo was built, and by the record in the action, the Munros rested their claim for damages squarely and exclusively on the proposition that the mere *establishment* of the zoo (without regard to the method of its *operation*) depreciated the value of the Munro's property, wherefor the city was liable on a theory of "reverse condemnation" or a theory of nuisance. It is true that the Munros made some mention of three instances of damage from water or mud flowing onto their property from the zoo, but the evidence did not identify the cause as to whether it was something *temporary* occurring during construction of the zoo or was of a permanent nature, and the instructions did not submit any issue of damages attributable to the water or mud. It is true also that the Munros mentioned noise from a miniature train operated on the zoo grounds, and from automobiles entering and leaving the grounds, but the train noise was in the category of a temporary nuisance easily remediable and thus not furnishing a basis for recovery of damages for permanent diminution of market value, and the auto noise was not shown to be in excess of that experienced generally by persons who reside along heavily traveled streets, so it did not furnish a basis for recovery of damages. See Louisville and Jefferson County Air Bd. v. Porter, Ky., 397 S.W.2d 146.

The fact that the claim of damages was not predicated on water or mud intrusion, or noise, is shown conclusively by the following excerpts from the testimony:

(William Munro)

"Q. 151—All right. And in your opinion was the damage suffered on the announcement of the site, we are referring mainly to this January 1965 date when the ground was actually broken?

A—I would say that is when the devaluation took place."

(A neighbor)

"Q. 8—Has there in your opinion been a change in the values in that neighborhood?

A—Yes, sir.

Q 9—Again, in your opinion, what was the cause of that change?

A—The location of the zoo.

\*   \*   \*   \*   \*   \*

Q. 14—Tell us why that property was depreciated and how?

A—From the time that the zoo was announced I think that on property values, in my way of thinking, our property values went down, since that time there has been very little activity in the subdivision, the lot next to me has never sold."

(Another neighbor)

"Q—16 In your opinion the establishment of that zoo, did that lessen property values in that neighborhood \* \* \*?

A—In my opinion it did.

\*   \*   \*   \*   \*   \*

Q. 25—In your opinion the property was reduced substantially in value?

A—True.

Q. 26—And again, your opinion, this was based upon the installation of the zoo, is that true?

A—That's true."

(A realtor)

"Q. 9—All right. In your opinion did the establishment of the zoo at that site affect the value of the properties adjacent thereto.

A—I would think that so far as single family residences are concerned it certainly affected the value downward.

\*   \*   \*   \*   \*   \*

Q. 14—Mr. Boyles, do you think that this property has increased or decreased in value since the announcement and breaking of ground for the zoo?

A—It has decreased in value.

Q. 15—Do you think that the entire decrease is reflected at this minute, or at what minute do you think that might occur?

A—Well, I think that probably the decrease in value, the effective value will come basically in two stages, one, it was certainly affected with the announcement of the zoo, and this I would have to couple with breaking ground and building and establishing the zoo. \* \* \* I don't think that they have witnessed the full result of the zoo, probably until it is in full operation, and more probably until late this summer or this summer the more the zoo is used, the more effect this will have \* \* \*"

(Another realtor)

"Q. 10—First of all, you say that the establishment of the zoo was detrimental to this property?

A—Yes, sir.

Q 11—Was it a substantial detriment, or what you might in layman's language say a minor league detriment?

A—I think it would be a considerable detriment to the property, it would affect its value, oh, between, percentage-wise, would affect the value of it from 20 to 30 percent.

\*   \*   \*   \*   \*   \*

Q. 17—You say that when the zoo was selected in this area, that at that time there was a determination made that the lending would be lesser in this area than it was formerly?

A—Yes, sir, that's correct. \* \* \*

\*   \*   \*   \*   \*

Q. 50 (Cross-examination)—Just one question, Mr. Hoffman: In your professional opinion as a realtor, the institution of a commercial building or a church or a

school or a railroad track would be detrimental to adjoining property owners the same as the creation of the zoo was, is that not correct?

A—Yes, sir."

Further indication of the theory on which the plaintiffs' case was presented is found in the instructions, which authorized recovery on a finding that the *establishment* of the zoo would be reasonably *expected* to cause annoyance to the plaintiffs and that the market value of the plaintiffs' property had been reduced by the *establishment* of the zoo "at this place." And when objection was made to the instructions, by the city, on the ground that "there is no evidence in the record sufficient to try the case as a nuisance case," the trial judge replied: "There is not any evidence in there except it should be anticipated and I have tried to put that thought in."

■ The plaintiffs, despite their apparent belief that it is so, have cited no authority for the proposition that a zoo is a nuisance per se, nor do we believe there is any validity in that proposition, in the light of the cases in which we have held not to be nuisances per se such things as a sewage treatment plant, Bartman v. Shobe, Ky., 353 S.W.2d 550; an airport, Louisville and Jefferson County Air Board v. Porter, Ky., 397 S.W.2d 146; an undertaking establishment, L. D. Pearson & Son v. Bonnie, 209 Ky. 307, 272 S.W. 375; and a cemetery, McCaw v. Harrison, Ky., 259 S.W.2d 457.

■■ The zoo not being a nuisance per se, it was incumbent upon the plaintiffs to prove that it was in fact a nuisance, which they failed to do. Apparently the plaintiffs, and the trial court, were under the impression that Louisville Refining Company v. Mudd, Ky., 339 S.W.2d 181, in referring to use of one's property that causes "annoyance" to another, means that a *dislike* by a person of another's use of property is an "annoyance" which may give rise to a claim for damages. Of course,

*Mudd* has no such meaning. The opinion in *Mudd* makes clear that the kind of "annoyance" it refers to is "such as to interfere materially with ordinary physical comfort or the reasonable use of property." As we said in Gem-Elkhorn Coal Co. v. Everidge, Ky., 309 S.W.2d 755, the rule that each property owner must use his own property in such a manner as not to "interfere" with that of his neighbor does not mean that every annoyance constitutes an injury for which damages may be granted.

■ The general rule, as set forth in 58 Am.Jur.2d, Nuisances, sec. 42, p. 607, is that in order to be a nuisance the use of property must disturb *physical* comfort or be offensive to *physical* senses.

■ The plaintiffs in the instant case proved no more than that the value of their property depreciated when the site was selected for the zoo. That proof did not authorize any recovery on a nuisance theory. The plaintiffs maintain, however, that they were entitled to recover on the theory of "reverse condemnation."

We are not cited to, or aware of, any case in which recovery was allowed on the theory of "reverse condemnation" where the alleged taking, injury or interference did not have *physical* aspects. The plaintiffs cite Paducah v. Allen, 111 Ky. 361, 63 S.W. 981, City of Louisville v. Hehemann, 161 Ky. 523, 171 S.W. 165, Com., Department of Highways v. Gisborne, Ky., 391 S.W.2d 714, and Shipp v. Louisville and Jefferson County Air Board, Ky., 431 S.W.2d 867, but each of those cases involved a *physical* taking or injury. In *Allen* infection by contagious disease was involved; in *Hehemann* the plaintiffs' property was invaded by flies, rats and offensive odors; in *Gisborne* there was physical injury to the plaintiffs' land; and in *Shipp* the damages consisted of cutting down trees. In the instant case, the plaintiffs claim that the depreciation of value occurred when the selection of the site for the zoo was announced, which fact

involved nothing evenly remotely of a physical nature.

In 26 Am.Jur.2d, Eminent Domain, sec. 163, pp. 834, 835, the law is stated to be as follows:

"* * * It is generally agreed that the damage clause of the state constitutions has no application to the depreciation of the market value of a parcel of land caused by the establishment of some public building or other public undertaking in close proximity thereto, when there is no physical injury to the property or impairment of any right appurtenant thereto, and the public use is not of such a character as would have constituted a nuisance at common law and given rise to an action by an adjoining owner in the absence of statutory protection. Thus, although the establishment of a cemetery, a fire engine house, a water tower, a jail, a hospital, or a school, or a playground therefor in a residential district may have an actual determinable effect on the market value of land in the neighborhood, reducing such value to a considerable degree, the owners of the property are not as a rule entitled to compensation. * * *"

It is our conclusion that the plaintiffs did not establish a basis for recovery under either a nuisance theory or a "reverse condemnation" theory.

In Louisville and Jefferson County Air Board v. Porter, Ky., 397 S.W.2d 146, at 152, this court said:

"It is fundamental that a buyer of property assumes the risk of changing community conditions. Sometimes the value of his property is enhanced, and he does not have to pay for the enhancement. Sometimes it declines, and he has no recourse. These facts of life are not subject to an exception simply because the source of the transition can be identified and is suable. * * *"

The foregoing comments seem to be particularly appropriate here.

The judgment is reversed with directions to enter judgment dismissing the complaint, in accordance with the defendant's motion for judgment notwithstanding the verdict.

All concur except STEINFELD, J., who did not sit.