Dora and Connis **MERCER**, et al., Plaintiffs,

v.

**ROCKWELL INTERNATIONAL CORPORATION**, Defendant.

**No. CIV. A. 187CV–106–H.**

United States District Court, W.D. Kentucky.

Sept. 1, 1998.

Charles E. English, Jr., English, Lucas, Priest & Owsley, Bowling Green, Janet Jobe Crocker, Crocker & Wilkey, Franklin, Daniel R. Dolan, II, Dolan & Domenici, El Paso, TX, for Plaintiffs.

M. Stephen Pitt, J. Anthony Goebel, Donald J. Kelly, Wyatt, Tarrant & Combs, Louisville, Barry P. Goode, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Defendant has once again moved for a dismissal. To begin, the Court has reviewed its previous opinions in this case to better assess their consistency throughout and now to better assess their application to the actual proof. Thereafter, the Court has completely reviewed its most important legal finding—the elements required for finding negligent trespass in these circumstances. That review of this complex subject confirms in general the Court's legal conclusions, but with some refinements. Finally, the Court has thoroughly reviewed the evidence—most particularly Plaintiffs' expert witnesses—which is now transcribed. Then, the Court applied that testimony to the applicable law. It is this task which has occupied the Court's time and concern.

Defendant has moved for Judgment as Matter of Law pursuant to Federal Rule of Civil Procedure 50. The motion is more like one for judgment notwithstanding the verdict based upon the evidence at the first trial which is now transcribed. Rule 50 allows a court to enter a Judgment as a Matter of Law pre- and post-verdict. A court can enter such judgment at the close of trial even when the jury did not return a verdict. *See Fed.R.Civ.P.* 50(b)(2)(B). In considering Defendant's Motion, the Court must exercise a de novo review. *See American and Foreign Ins. Co. v. Bolt,* 106 F.3d 155, 157 (6th Cir. 1997). To grant Defendant's Motion the Court must find that "viewing the admissible evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." *Id.* (citations omitted). The Sixth Circuit has also stated that "sufficient evidence for submission to the jury will be found 'unless, when viewed in the light of those inferences most favorable to the non-movant, there is either a complete absence of proof on the issues or no controverted issue of fact upon which a reasonable person could differ.' " *Id.* (citations omitted). The Court should only consider issues raised in the pre-verdict motions. Thus, the Court should not consider evidence which might be presented in a future trial. *Cf. Id.* at 160.

## I.

From 1957 to 1989, Defendant operated a plant in Russellville, Kentucky, which manufactured gas meter components and typewriter housings. In that process, Defendant used die cast machines to mold molten aluminum. These machines required hydraulic fluid to operate. Between 1959 and 1971, Defendant purchased at least 377,000 pounds of PCB containing products. Eventually, massive amount of this product either leaked from the plant or was stored in a lagoon nearby.

Due to Defendant's negligence or possibly gross negligence, a substantial amount of the PCB laden waste escaped into the drainage system and contaminated the Town Branch of the Mud River. Defendant's delay in doing anything about the problem further contributed to the spread of the PCB waste. As a consequence of separate enforcement action filed by the Kentucky Natural Resources and Environmental Protection Cabinet, Defendant is now acting under order of the Franklin Circuit Court which requires Defendant to characterize and remediate ground water, surface water, sediments and flood plain soils along Town Branch, in accordance with the court's standards. The court also ordered continued characterization of sediments and flood plain soils along the Mud River and remediation of all "hot spots."

Our case is one vastly different—both factually and legally—from the one which the Franklin Circuit Court entertained, though both have their genesis in the same egregious conduct. From the very beginning of this case, the various Plaintiffs have had difficulty finding any evidence of medical problems arguably caused by exposure to PCB's or even any evidence that PCB's existed on their property. This should not have been surprising since these properties are located on the lower Mud River some 50 miles downstream from Town Branch which then runs about 3½ miles up to the former Rockwell plant.

The original the complaint, filed some eleven years ago, contained about fifteen (15) property damage claims. Many of these are already dismissed after initial discovery because no PCB's could be found on the property. Originally, the complaint contained over 20 claims of personal injury, none of which could be supported by any evidence. Thus, it is fair to say that the parties come to this point having had many opportunities to present all the evidence remotely relevant to this case. Consequently, some of this Court's prior considerations of that evidence provides a valuable context to the Court's current task.

In its January 22, 1997, Memorandum and Order, the Court concluded that "Dr. Birge's report establishes contamination, [however] ... whether the PCB's levels are significant is also disputed. During the course of the litigation no one has established a relationship between any medical or physical problem and exposure to PCB's. Plaintiffs have produced no proof of disease in the fish, or

damage to animals or crops. Plaintiffs could not establish the presence of metals, dibenzodioxins or diobensfurans in quantities sufficient to represent a hazard." As a consequence of this and later findings, the Court dismissed all personal injury claims.

On September 16, 1997, the Court considered Defendant's motion to exclude Plaintiffs' expert witnesses. In doing so, the Court also reviewed the sufficiency of the evidence as to the medical monitoring and properties damage claims. After first reviewing the elements of a claim for medical monitoring, the Court ultimately determined that the individual Plaintiff's failed to present evidence that they "were significantly exposed to a proven hazardous substance [and] suffered a significantly increased risk of contracting a serious latent disease as a result of the exposure." The Court granted summary judgment for Defendant as to the medical monitoring claim.

In the process of reaching this last conclusion, the Court reviewed the opinions of Drs. George Rodgers, Larry Robertson and Michael Kelly. Of critical importance in that analysis was the question of whether Plaintiffs' exposure to PCB's was sufficient to cause a significantly increased risk to Plaintiffs' health. Central to this issue was Rodgers' contention that even one molecule of PCB's is sufficient to cause an increased health risk. The Court analyzed that proposition as follows:

> Plaintiffs remind the Court that in *Paoli II* the Third Circuit found that an expert testifying that even one molecule is sufficient to cause an increased health risk is admissible. Rodgers seems to make this statement in the *Daubert* hearing (*Daubert* hearing at 1161). This Court cannot agree that such a standard is appropriate or scientifically reliable. The Court finds no human or animal studies which demonstrate that such low levels of PCB exposure increased one's risk of cancer or other diseases, for that matter. Proof of more than such limited exposure must be required, unless the hazardous substance is demonstrated to cause injury or disease even in small doses. Such a standard is necessary if liability for the tort is to be something more than the whim of the jury.

As to the property damage claims, the Court determined that Dr. Birge's study established an actual contamination, even though the levels of PCB's on the properties were quite low. The Court concluded that Dr. Rodgers could not establish that *these Plaintiffs* were sufficiently exposed to PCB's to cause an increased risk to their health. The Court did not conclude that such an increased risk could not exist.

Prior to trial the Court directed a verdict in favor of Plaintiff on the issue of Defendant's negligence. After all the evidence was presented, the Court instructed the jury on the elements of negligent trespass and, among other things, required that it find the "PCB's from Defendant's facility are present on a Plaintiff's property in levels sufficient to cause real harm." Moreover, the Court instructed the jury that "evidence concerning fair market value must have a foundation in fact rather than being based merely upon subjective belief or a perceived stigma." After the jury could not reach a decision, the Court was forced to declare a mistrial.

On November 13, 1997, the Court considered and again rejected Defendant's motion for directed verdict. The Court did everything but sustain that motion. It noted the many weaknesses of the case, any number of which could have been viewed as fatal. Ultimately the Court did not feel comfortable dismissing the case. Referring to Dr. Rodgers' testimony, the Court concluded that "Plaintiffs have presented some evidence that even at levels this low, PCB's can be harmful." Ultimately, it is this last conclusion which this Court will re-examine.

Reviewing all these memoranda, the Court finds that it has dealt very consistently with difficult legal issues and rather inconclusive evidence. Some of the issues present difficult problems, such as the difference, as applied to these facts, between the standard of proof for a personal medical monitoring claim and a negligent trespass claim as to property. The Court will discuss that issue in Section III of this Memorandum Opinion. First, the Court will analyze the legal stan-

dard of proof under Plaintiff's claim for negligent trespass.

## II.

The only cause of action remaining in this case is grounded upon negligent trespass. The parties continue to disagree about whether Plaintiffs must show "real harm" and what constitutes such harm. Plaintiffs claim that Defendant negligently released PCB's from its facility and that the mere presence of those PCB's on their properties decreases their fair market value. Plaintiffs assert that they need only show the presence of PCB's on the property. The injury, they say, is the lost fair market value.

The seemingly straightforward claim is complicated by the fact that Plaintiffs seek damages for a negligent trespass by an object which is generally imperceptible to human senses. All of this impresses the Court that it must undertake a more comprehensive consideration of the basic elements of trespass; its distinction from nuisance; and its interrelationship with Kentucky law regarding stigma. Ultimately, this thorough review convinces the Court that its original instruction may not have been the best statement of Kentucky law. Nevertheless, the Court has become convinced that Plaintiffs are wrong in saying that they need only show the presence of PCB's on their property.

### A.

Kentucky law allows recovery under trespass in either of three instances: (1) the defendant was engaged in an extra-hazardous activity, (2) the defendant committed an intentional trespass or (3) the defendant committed a negligent trespass. *See Randall v. Shelton*, 293 S.W.2d 559 (Ky. 1956). The Court has not discovered any Kentucky case stating the "elements" of a negligent trespass theory. However, Kentucky would follow the Restatement (Second) of Torts § 165 as do numerous other jurisdictions. *See, e.g. Karpiak v. Russo*, 450 Pa.Super. 471, 676 A.2d 270 (Pa.Super.Ct.1996), *Watson v. Brazos Electric Power Coop., Inc.*, 918 S.W.2d 639 (Tex.Ct.App.1996); *Fortier v. Flambeau Plastics Co.*, 164 Wis.2d 639, 476 N.W.2d 593 (Wis.Ct.App.1991).

The Restatement (Second) of Torts § 165 provides:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

The Restatement distinguishes intentional trespasses and negligent trespasses by requiring 'harm' for negligent trespass. *See* Restatement (Second) Torts § 165 cmt. b. Liability is imposed for intentional trespasses when there is an intrusion, even when it is harmless, and liability is imposed for negligent trespasses only when there has been harm to the property. *See id.*

Indeed, the plain language of the Restatement and its comments would allow this Court to conclude, without any additional explanation, that negligent trespass requires actual harm to the property. "One ... is subject to liability to the possessor if, but only if, ... the presence of the thing ... upon the land causes harm to the land, to the possessor, or to a thing ...." Restatement (Second) Torts § 165 cmt. b. The comments further state that an actor is liable only for harm that is "an impairment of the physical condition of the land or an invasion occurring on the land of some other legally protected interest of the possessor, connected with his interest of exclusive possession." *Id.* at cmt. c. But the Court need not rely just on the Restatement, because several other courts have faced situations similar to the one at bar and concluded, for a variety of reasons, that there must be actual harm to the property.

For our purposes, the Restatement requires three basic elements for a negligent trespass: (1) the defendant must have breached its duty of due care (negligence); (2) defendant caused a thing to enter the land of plaintiff and (3) the thing's presence causes harm to the land. The Court has

already found Defendant negligent as a matter of law, so the first requirement is met. The more difficult and interesting question is whether Plaintiffs have demonstrated an entry onto their land which caused harm.

## B.

Plaintiffs contend that the PCB's are an entry of a thing onto their land causing harm.[1] This would be obvious if PCB's were as big as a house or as noticeable as red paint. Unfortunately, the PCB's are as invisible as the wind and as unobtrusive as a grain of sand. In circumstances such as this, courts have been reluctant to find a trespass. *See e.g., Bradley v. American Smelting & Refining Co.*, 104 Wash.2d 677, 709 P.2d 782 (Wash.1985). Indeed, even in the case of intentional trespass where harm would normally be irrelevant, courts have required plaintiffs to show that their property has been harmed by the "thing." In the context of intentional trespass, courts have reasoned that "entry" by an invisible object traveling indirectly cannot be proven without a showing of harm to the property. The analysis in these cases is directly applicable to a claim for negligent trespass because negligent trespass has as its express elements "entry" *and* harm.

 Trespass does not protect against mere entrance, it protects against another's interference with an owner's right to exclusive possession of the property. *See* W. Page Keeton, et al., Prosser & Keeton in the Law of Torts § 13, at 71 (5th Ed.1984). Normally, entry would qualify as interference. However, not every touching of the land interferes with that right to exclusive possession of the property. Although the "right to exclusive possession" is liberally interpreted so as to not subject property owners to most uninvited intrusions, some entries may be so insubstantial or so trifling that they will not infringe upon the legally protected interest in freedom from interference with exclusive possession. *See Martin v. Reynolds Metals Co.*, 221 Or. 86, 342 P.2d 790 (Or.1959).

Perhaps the earliest opinion dealing with the question of whether invisible entries can be a trespass was in a case similar to this one. In *Martin v. Reynolds Metals Co.*, 221 Or. 86, 342 P.2d 790 (Or.1959), the plaintiffs brought a claim for intentional trespass against the defendant aluminum reduction plant. The factory caused gas and particle fluoride compounds to become airborne and settle onto the plaintiffs land. The contaminated forage and water were unsuitable for livestock and poisoned plaintiff's cattle. The defendant argued that there was no tangible invasion of plaintiff's property, thus there was no trespass.

The court adopted a new rule that even materials invisible to the naked eye may form a trespass. What should matter, the court stated, is the "energy or force of the object" and not its size. It recognized that such a holding may render trespass indistinguishable from other causes of action such as nuisance, and emphasized that trespass protects the right of exclusive possession, i.e. one's sense of ownership. Therefore, there must be some damage to the property before there is an 'entry.' *See id.* at 796. The court stated that in every trespass case

> the court is presented with a problem of deciding whether the defendant's intrusion has violated a legally protected interest of the plaintiff. In most cases the defendant's conduct so clearly invades the well established possessory interest of the plaintiff that no discussion of the point is called for.... There is a point where the entry is so lacking in substance that the law will refuse to recognize it, applying the maxim *de minimis non curat lex.* Thus it would seem clear that ordinarily casting of a grain of sand upon another's land would not be a trespass.... [W]here the [substance] is cast upon the plaintiff's premises **in a manner which does no actual damage** or causes no interference in any way with a legitimate use of the premises then there is no reason for recognizing an invasion of the plaintiff's possessory interest.

*Id.* at 793–95 (emphasis added).[2]

Many other courts have allowed trespass claims for invisible particles, but like the

1. They say that the harm is the loss of fair market value.

2. The court seemed to suggest that even non-intrusions could form the basis of a trespass if

Oregon court they circumscribe the reach of this rule by requiring actual damage to the property. For instance, the Supreme Court of Alabama held that a plaintiff may bring a trespass claim for the invasion of invisible lead particles if "the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the Res." *Borland v. Sanders Lead Co.,* 369 So.2d 523, 530 (Ala.1979). The defendant submitted that the plaintiff could not recover because the invasion was not sufficient to be a trespass. The Alabama Supreme Court adopted *Martin v. Reynolds'* "force and energy" test by holding that even microscopic materials can form a trespass if they harm the property. Recognizing that trespass and nuisance protect different interests in real property, it "hasten[ed] to point out there is a point where the entry is so lacking in substance that the law will refuse to recognize it, applying the maxim *de minimis non curat lex* the law does not concern itself with trifles." *Id.* at 529.[3]

Some courts which emphasize the necessity of harm for an intentional trespass have adopted the concept of "real and substantial" damage to the res in various forms. The United States District Court for the Western District of Washington certified to the Washington Supreme Court the question of whether injury to the land must be demonstrated. *See Bradley v. American Smelting & Refining Co.,* 635 F.Supp. 1154 (W.D.Wash.1986). Imperceptible particulate emissions of cadmium and arsenic had come to rest on plaintiffs' property and plaintiffs claimed trespass. The Supreme Court of Washington seemed to adopt the reasoning of *Borland* when it

held that there must be "actual and substantial" damages before a plaintiff can recover in trespass. The court reached this decision after considering the policy ramifications of allowing landowners to bring a trespass claim in circumstances where airborne particles, imperceptible to human senses, are the basis for the claim: [4]

> No useful purpose would be served by sanctioning actions in trespass by every landowner within a hundred miles of a manufacturing plant. Manufacturers would be harassed and the litigious few would cause the escalation of costs to the detriment of many ... [T]he plaintiff who cannot show that actual and substantial damages have been suffered should be subject to dismissal of his cause upon a motion for summary judgment.

*Bradley v. American Smelting & Refining Co.,* 104 Wash.2d 677, 709 P.2d 782, 791 (Wash.1985).

Although this Court agrees with much of these cases' reasoning, the Court rejects language requiring "real and substantial" or "actual and substantial" damage. If what is at issue in those cases is whether the intrusion is sufficient to rank as a trespass onto the land, proof of actual damage should be sufficient. Furthermore, the effect of requiring "real and substantial" harm to show an entry is really to adopt the rule already existing in the Restatement's formulation for negligent trespass: there must be harm to the property. *Cf. Karpiak v. Russo,* 450 Pa.Super. 471, 676 A.2d 270, 275 (Pa.Super.1996)(A plaintiff claimed nuisance and negligent trespass against the defendant

---

the interference is significant enough and adopted a balancing test for determining when a trespass has occurred. Although this Court finds much of the opinion well-reasoned and persuasive, not all of this opinion is consistent with the Court's understanding of Kentucky law.

3. In reaching this conclusion, the Alabama Supreme Court relied on *Martin v. Reynolds,* but did not adopt its entire holding. For instance, the Alabama court did not seem to accept the view that trespass, like nuisance, requires a balancing of the defendant's conduct against the harm caused plaintiff.

4. Many of these cases emphasize three factors in stating a requirement of harm: (1) that the con-

duct was intentional; (2) that the object was dimensionally invisible; and (3) that the object was an airborne substance. The Court believes that of these factors, the most important is the nature of the intruding object—its being imperceptible. Logically, that is what should matter in determining whether there has been an 'entry,' as opposed to the nature of the defendant's mind set. Nevertheless, to the extent that the mode of arrival onto the property matters, the Court concludes there is very little difference between minute particles traveling via the air and minute particles traveling via a river. Thus the analysis in these cases is directly applicable.

landscaping company because dust had settled on her property. The court easily dismissed plaintiffs' negligent trespass claim because there was no evidence that they "suffered ailments from the dust nor was there evidence that the dust caused any corrosive damage to their property."). *See also Brown Jug, Inc. v. International Brotherhood of Teamsters,* 688 P.2d 932 (Alaska 1984); *Lever Bros. Co. v. Langdoc,* 655 N.E.2d 577 (Ind.Ct.App.1995); *Furrer v. Talent Irrigation District,* 258 Or. 494, 466 P.2d 605, 615 n. 12 (Or.1970).

■■■■] The Court finds all these cases helpful in predicting Kentucky law. Trespass is designed to protect against interference with exclusive possession, and not just mere entry. When an object can be seen or sensed in some manner, one may even assume that a landowner's right to exclusively possess his property is infringed. When the "thing" that has entered plaintiff's property is imperceptible to ordinary human senses, it does not so obviously infringe upon a landowner's right to exclusive possession. In such cases, only when the substance actually damages the property does it intrude upon the landowner's right to exclusive possession. Therefore, an essential element of Plaintiffs' claim is that the PCB's interfere with their right to exclusive possession by causing actual harm to the property.

One might say that the Court has "labored long and produced a mouse." While that may be true, this lengthy analysis informs the next stage of discussion. The Court must now determine what kind of proof might constitute "actual harm."

## C.

■■■ In *Bradley v. American Smelting and Refining,* upon certification, the Washington Supreme Court announced the new rule that in cases involving an intentional trespass by imperceptible cadmium and arsenic deposits there must be real and substantial harm to the property. The federal district court was left to decide whether the deposits harmed plaintiff's property. *See Bradley v. American Smelting & Refining Co.,* 635 F.Supp. 1154, 1157 (W.D.Wash. 1986). The federal court eliminated the most obvious injuries to the real property: the deposits were imperceptible to human senses and there was no demonstrable effect on plaintiff's property. The court also rejected plaintiff's argument that the diminished fair market value constituted an injury to his property. According to the district court, any evidence of diminished fair market value can only serve to quantify the magnitude of the injury otherwise proven. *See id. See also, Mock v. Potlatch,* 786 F.Supp. 1545, 1551 (D.Idaho 1992). Thus the court concluded that if there was any injury it "must consist of a hidden hazard." *Bradley,* 635 F.Supp. at 1157. The expert testimony revealed that at these low levels cadmium and arsenic are not harmful and therefore do not constitute an injury to plaintiff's property. Had the imperceptible substance posed some sort of health hazard, then there would have been a sufficient injury to support a claim of trespass. *See id.*

■■■■] The Court agrees with this approach. Although PCB's are invisible and are not detectable by any other human sense, it is still possible to show that they harm the property. Decreased fair market value is not harm to the property, it is only a means of measuring the harm. Every negligent injury to real property sounds in trespass *(see Wimmer v. City of Fort Thomas,* 733 S.W.2d 759 (Ky.Ct.App.1987)) and no cause of action exists for the tortious interference with fair market value, *see Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 487 N.W.2d 715, 724 (Mich.1992)(rejecting a claim of tort liability for depreciation in fair market value); *In Re Paoli,* 35 F.3d 717, 798 n. 64 (3d Cir.1994). *See also City of Louisville v. Munro,* 475 S.W.2d 479 (Ky.1971); *McCaw v. Harrison,* 259 S.W.2d 457 (Ky.1953). Furthermore, for any *negligent* trespass mere touching is never enough. Even if the "thing" is obvious. *See Brown Jug, Inc. v. International Bhd. of Teamsters,* 688 P.2d 932 (Alaska 1984); *Karpiak v. Russo,* 450 Pa.Super. 471, 676 A.2d 270 (Pa.Super.Ct.1996); *Watson v. Brazos Elec. Power Coop., Inc.,* 918 S.W.2d 639 (Tex.Ct.App. 1996). Finally, as will be discussed, the Court concludes that stigma alone is not actual physical harm to the property. Con-

744

sequently, the only avenue available for Plaintiffs to prove harm is the presence of a health hazard.

■■■ Plaintiffs have hinted all along that they believe the harm suffered is the public's perception that the property is unsafe. Some scholars suggest that stigma is a harm to property and therefore is a basis for recovering fair market value. The Court disagrees that this is the rule in Kentucky. In fact, most commentators agree that one is more likely to recover for stigma damages when the property has been physically damaged by a toxic substance. *See generally* Carol E. Dinkins & Lewis C. Sutherland, *Overview: Recent Trends and Developments in Environmental and Toxic Tort Litigation,* SB 73 ALI–ABA 261 (1997).

For instance, in *In re Paoli,* 35 F.3d 717 (3d Cir.1994) plaintiffs sought repair costs plus the diminution in market value caused by the presence of PCB's. They claimed that once the PCB's were remediated people would still be afraid to buy the property. The question before the court was whether stigma is a *permanent* injury to real property since fair market value is only awarded in permanent injury cases.

As in our case, the issue of permanency is important because a plaintiff may recover only the difference in fair market value if the injury is permanent. Unlike *Paoli,* this Court has already determined that if there is any injury to the property it would be permanent. What is useful about *Paoli* is the way the Third Circuit analyzed the question of whether stigma is in fact a permanent injury to real property.

Importantly, that court first observed that permanent injury usually denotes permanent *physical* injury to the property. Having recognized this traditional limitation, the court noted that the reason for allowing difference in fair market value is to compensate a plaintiff when repair costs are insufficient. Therefore, the court held that the permanent injury does not need to be physical.

The court said plaintiffs had shown permanent injury to the property in two ways. First, they had shown a permanent physical injury because even after being remediated

to 2 parts per million PCB's the property would still pose an actual health hazard. The second way plaintiffs demonstrated permanent injury was through the public's fear of the PCB's. The public's fear of buying the property is, the court said, a permanent injury.

The court limited this last holding to instances where there has been at least a temporary *physical* damage to an owner's property. *See In re Paoli.* 35 F.3d at 797. *See also Berry v. Armstrong Rubber Co.,* 989 F.2d 822 (5th Cir.1993)(Mississippi law will not allow recovery for stigma without accompanying physical harm to the property); *Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 487 N.W.2d 715 (Mich.1992)(there must been an invasion of a legally cognizable right); *Wade v. S.J. Groves & Sons Co.,* 283 Pa.Super. 464, 424 A.2d 902 (Pa.Super.Ct.1981) (recovery for stigma allowed where property had been temporarily damaged by mud slide).

Stigma damages are recoverable only in instances where there has been physical damage to the property in the first instance. Requiring physical damage eliminates concerns that owners may collect damages in situations where public policy disfavors compensation. For instance, home owners could not receive decreased fair market value if a group home for the disabled moves into the neighborhood or when someone with AIDS moves next door. *In re Paoli* 35 F.3d at 798 n. 64. Physical damage also prevents windfall recoveries for routine fluctuations in market prices. *See id.*

In accordance with these cases and its own legal precedent, it seems that Kentucky law will not allow recovery for stigma absent some physical harm to the property. In *Morgan v. Hightower's Adm'r,* 291 Ky. 58, 163 S.W.2d 21 (Ky.1942), the court held that there could be no recovery in trespass for decreased fair market value when a person commits suicide on an owner's property. An injury to the reputation did not constitute "waste" or trespass. Although *Morgan* seems to prohibit any recovery for stigma, Kentucky has allowed proof that buyers' fears affect the market value in condemnation cases. Even then, Kentucky courts have

required some physical injury to the property.[5] *See City of Louisville v. Munro*, 475 S.W.2d 479 (Ky.1971)(plaintiffs said there had been an 'inverse condemnation' where rumors of the zoo opening caused their property value to decrease and the court held that there could be no recovery where the "alleged taking, injury or interference did not have physical aspects."). *See also Kentucky Hydro–Electric Co. v. Woodard*, 216 Ky. 618, 287 S.W. 985 (Ky.1926); *Tennessee Gas & Transmission Co. v. Jackman*, 311 Ky. 507, 224 S.W.2d 660 (Ky.1949); *Gulledge v. Texas Gas Transmission Corp.* 256 S.W.2d 349 (Ky. 1952).

▮▮▮▮ These cases are not directly on point, but they are a good predictor of what a Kentucky court would do if faced with a case like the one at bar. Indeed, the Third Circuit found Kentucky condemnation case law persuasive on the issue of whether fair market value can be recovered for stigma damages. *See In re Paoli*, at 796 (citing *Kentucky Hydro–Electric Co. v. Woodard*, 216 Ky. 618, 287 S.W. 985 (1926)). Under Kentucky law, a plaintiff can recover for decreased fair market value due to public's fear if there is accompanying physical harm to the property. *Cf. Lamb v. Martin Marietta Energy Sys. Inc.*, 835 F.Supp. 959 (W.D.Ky. 1993)[6] (holding that plaintiffs cannot recover in nuisance for diminution in fair market value due to public's fears when there is no contamination).

Based upon the foregoing, the Court concludes that since the substance at issue in this case is completely imperceptible to human senses, it seems that the only way to demonstrate harm to the property is to show that the substance, as it is on the property, is hazardous. *See e.g. Bradley v. American Smelting & Refining Co.; Karpiak v. Russo*, 450 Pa.Super. 471, 676 A.2d 270, 275 (Pa.Super.Ct.1996) and *In re Paoli*, 35 F.3d 717 (3d Cir.1994). Plaintiffs may recover if they demonstrate that the amount of PCB's on their property now are a health hazard. If Plaintiffs demonstrate this, then the issue of stigma will not present itself because Plaintiffs can recover any decreased fair market value resulting from the permanent injury.

### III.

Initially, Defendant argues that the Court's previous rulings of fact and law now require dismissal of the remaining claims. Specifically, Defendant contends that because the Court has dismissed Plaintiffs' claims for medical monitoring, the same analysis requires dismissal of the property damage claims.

To be sure, the two claims are related and rely on much of the same evidence. However, the evidence for each focuses on different objects. The medical monitoring claim focuses upon the exposure of individuals; the property damage claim focuses on exposure and harm to the property. Furthermore, Dr. Rodgers was unable to link the exposure to risk of any particular disease. Thus, the failure of Dr. Rodgers to examine or question

---

5. Generally, in Kentucky stigma damages are limited to instances where plaintiffs show "(1)That there is a basis in reason and experience for a fear ...; (2) that such a fear enters into the calculations of a substantial number of persons who deal in the buying or selling of similar property; and (3) depreciation of market value because of the existence of such fear." *Gulledge v. Texas Gas Transmission Corp.*, 256 S.W.2d 349, 353 (Ky.1952). The court further explained that "the fear ... is not a separate element of damages, but is to be considered only as it is expressed as a reason by a witness or witnesses in support of an estimate of depreciated value." *Id.* The language of this rule suggests that Kentucky law views fear of property or stigma as somewhat of a separate injury from actual physical damage to the property. *Cf. In re Paoli*, 35 F.3d 717 (3d Cir.1994); *Wade v. S.J. Groves & Sons Co.*, 283 Pa.Super. 464, 424 A.2d

902 (Pa.Super.Ct.1981). Perhaps Kentucky law allows recovery for both repair costs for the property actually damaged and any decreased fair market value for the remaining stigma. This issue need not be addressed in this case since any recovery by Plaintiffs would be for depreciated market value due to permanent physical injury to the property.

6. Although this Court agrees that stigma damages are not recoverable absent physical damage to the property, the Court disagrees with the conclusion that Kentucky nuisance law requires a "touching" of the land. *See McCaw v. Harrison*, 259 S.W.2d 457 (Ky.1953); *City of Louisville v. Munro*, 475 S.W.2d 479 (Ky.1971). *See also Huffman v. United States*, 82 F.3d 703 (6th Cir.1996)(Kentucky law allows nuisance claim based on noise.).

the individual Plaintiffs renders his opinion worthless as to whether any of them is at risk. On the other hand, he might reach valid conclusions about the consequences of PCB exposure on property generally. The evidence of PCB exposure as to individual defendants was different and a lot less precise than the evidence concerning contamination of individual properties. As the Court has previously observed, it views the standard of proof for medical monitoring as different to some degree than the proof required for a property damage claim. The medical monitoring claim required significant exposure causing a significantly increased risk. It is conceivable that two different results might obtain. Therefore, the Court does not believe that the remaining property damage claims must fail simply because the Court dismissed the medical monitoring claims.

Nevertheless, there are many similarities between the two claims. The one significant aspect of the Court's decision dismissing the medical monitoring claim was the Court's conclusion to exclude Dr. Rodgers' opinion that even one molecule of PCB's is hazardous. If Plaintiffs ultimately seek to rest their property damage claim upon the same Rodgers' testimony or something similarly unsubstantiated, then the Court would have to look very carefully at whether such testimony is scientifically reliable.

## IV.

■■ To analyze whether the proof is sufficient and scientifically reliable, the Court has thoroughly reviewed the testimony of both Dr. Wesley Birge and Dr. George Rodgers. It is upon the opinions of these two that Plaintiffs' case rests.[7] The other testimony shows no actual physical damage to the property; nothing that physically prevents its normal use; and nothing that affects its productivity as a farm. The evidence is that the small amounts of PCB's on the property have caused no damage to land, crops, wildlife, domestic farm animals or fish.[8] There is no evidence of harm to people.

### A.

First, Dr. Birge explained the biochemical structure of PCB's. He studied the riverene system, which included examining the flood plain area. This involved looking at an area up to 30 meters from the edge of the stream. He explained how PCB's may be transported from the spill site downstream to Plaintiffs' property.

Dr. Birge noted a steady decrease in PCB's after one passes along the Town Branch to the Mud River. PCB's tend to hang around the actual source of the contamination. Dr. Birge could find no alternative source of contamination other than the Rockwell plant. Therefore, he concluded that the

---

**7.** For purposes of this motion, the Court has not even considered the many witnesses for Defendant who testified about the exposure of Plaintiffs' property to PCB's and its possible effects. These witnesses were experts in their fields and gave valuable and convincing testimony. They said that the tests of Plaintiffs' properties in recent years showed mostly non-detectible levels of PCB's. They sharply criticized techniques used in Dr. Birge's latest tests which produced some of the higher PCB readings. They said that scientists have not determined whether PCB's actually cause cancer. They said that the scientific studies taken as a whole do not prove that PCB's cause cancer and no study of any kind suggests that either animals or humans might be harmed by exposure to low levels of PCB's such as those measured on Plaintiffs' property. They say that Dr. Rodgers is alone in believing that such small amounts of PCB's could represent a danger to anyone. Defendant's experts presented various types of analysis to show that the PCB's from Rockwell's plant may not have migrated to Plain-

tiffs' properties and that the levels of PCB's on those properties is below expected background levels. There is no question that as to the issues presented in this case, Defendant's experts present the mainstream scientific view. One could make the strong argument that this evidence was either unrebutted for the most part or so overwhelming as to preclude a contrary jury finding. The Court has chosen not to base its decision upon such an analysis. That did not prove necessary.

**8.** The Court has considered fish even though it is questionable that their condition is relevant on the issue of harm to the properties. The fish are not on the property, and therefore, may not properly affect harm to it. The state imposed fishing advisory is not relevant to considering whether the property itself constitutes a medical hazard. First, this is purely a government action. Second, the action does not concern a condition of the property.

PCB's on Plaintiffs' properties originated from the Rockwell plant.

Dr. Birge performed specific studies of some of the properties. As to the Croxton property, in 1994 Birge found a mean value of .14 parts per million ("ppm") and .27 ppm in 1997. On the Smith property, Birge found a mean value in 1994 of .20 ppm and in 1997 a mean value of .12 ppm. On the Cooke property, Dr. Birge in 1994 found .08 ppm and in 1997 found .37 ppm. On the Wilson property Dr. Birge found a total mean value of .16 ppm. On the Robinson property Dr. Birge found a total mean concentration of .12 ppm in 1997. On the Texal Morgan property Dr. Birge found a total mean value of .04 ppm in 1994. In 1997, he found a concentration of .07 ppm. He believed PCB's to be pervasive within the flood plain of each property.

## B.

Dr. George Rodgers is not a PCB researcher; he has written no papers; he has done no research. He has reviewed some PCB literature. Rodgers Trial Transcript, ("Tr.Tr.") pp. 8–9. He said that PCB's tend to accumulate. Rodgers Tr.Tr., p. 10. We ingest PCB's in a variety of ways. We can ingest them by eating fish. Rodgers Tr.Tr., p. 15. We can ingest them by having dermal contact. Rodgers Tr.Tr., p. 16. He explained how PCB's accumulate in soil and fish.

Dr. Rodgers explained that there are difficult problems with doing PCB research, both with animal research and cohort groups of people. Rodgers Tr.Tr., pp. 19–21. Nevertheless, he concluded that a growing body of literature finds that PCB's are potentially toxic. Rodgers Tr.Tr., p. 10.

The Environmental Protection Agency qualifies PCB's as "probable human carcinogens," meaning that PCB's are clearly carcinogenic in animal species and that the weight of the evidence suggests they are likely human carcinogens. Rodgers Tr.Tr., p. 24. The Agency for Toxic Substance Disease Registry ("ATSDR") has determined that PCB's may be reasonably anticipated to be carcinogens. Rodgers Tr.Tr., p. 26. Rodgers summarizes the area of concern

about PCB's, mentioning cancer, problems with newborns and problems with liver function.

As best the Court can determine, Rodgers based his opinions upon the following studies:

1. David P. Brown, *Mortality of Workers Exposed to Polychlorinated Biphenyls— An Update,* Archives of Environmental Health, Nov./Dec.1989, at 333. This study updates an earlier inconclusive study conducted in 1981. The 1989 study adds seven years' observation of the 2500 workers employed in two transformer manufacturing facilities. The updated study found "statistically significant increases in cancers of the liver, biliary tract and gall blander." Rodgers believes the finding was statistically significant. Defendant cross-examined Rodgers about this study and noted that ATSDR said that there were confounding variables. It said that the liver cancer noted in these studies cannot be definitely attributed to PCB exposure. Rodgers Tr.Tr., p. 37.

2. Bertazzi, 1987. This study concerned 2100 people who worked in a factory that were exposed to PCB's. He also found a statistically significant increase in the cancers of GI tract. Other increases in cancer were not statistically significant. (Rodgers, Tr.Tr. p. 38). Defendant questioned him about this study. ATSDR said that the limitations of the study include a small number of cases, short minimum exposure and a lack of pattern or trend. Rodgers Tr.Tr., pp. 124–25.

3. Thomas Sinks, *Mortality Among Workers Exposed to Polychlorinated Biphenyls,* 136 American Journal of Epidemiology 389 (1992). Study looked at 3600 people who worked at a electrical capacitor plant. Included in the study were people who had worked at the plant for at least 1 day between 1957 and 1977. They found a fourfold increase in the malignant melanomas which is a skin cancer. This was statistically significant. They also found increases in other cancers that were not statistically significant. Rodgers Tr.Tr., pp. 38–39. Defendant asked him about this study and ATSDR's conclusions that

the data is inconclusive due to limitations and other confounding variables. Rodgers Tr.Tr., p. 126.

4. Annalee Yassi, *Cancer Mortality in Workers Employed at a Transformer Manufacturing Plant*, 25 American Journal of Industrial Medicine 425 (1944). That study looked at 2200 people who worked at a transformer plant. It found a statistically significant increase in the number of tumors of the pancreas. Rodgers Tr.Tr., p. 39. Defendant questioned him about this study and noted that ATSDR stated "these results must be regarded as inconclusive due to the limitations such as exposure to other chemicals and the fact that no medical history of the workers was provided." Rodgers Tr.Tr., pp. 126–27.

5. Dana Loomis, Cancer Mortality Among Electric Utility Workers Exposed to Polychlorinated Biphenyls (Nov. 26, 1996) (unpublished study). This new study looked at 138,000 persons employed in the electrical power industry potentially exposed to skin contact with PCB's. The study shows an increased risk of melanoma and that the risk went up as their exposure to PCB's went up. The study found a statistically significant increase in the risk to melanoma correlated to the exposure to PCB's. Dr. Rodgers indicated that the fact that there is no immediate health hazard does not mean that there is no risk. (Rodgers, pp. 53–55). Defendant questioned Rodgers about this study and brought out the fact that for all other kinds of cancer, the number of cases was less than average for cancer. Rodgers admitted that from these studies we cannot conclude that PCB's cause liver cancer. However, Rodgers stuck to his opinion that the study shows that PCB's caused malignant melanoma, even though the article did not rule out a major cause of malignant melanoma, which is exposure to sunlight. Also, out of 138,000 person study in the highest cohort group, the researchers found only one case of malignant melanoma. It is from this one case that Rodgers reaches his conclusion. Rodgers Tr.Tr., pp. 130–35.

6. Rodgers mentioned a series of studies conducted by Joseph Jacobson concerning human development. Jacobson studied a group of women who reported eating a large amount of fish out of Lake Michigan. The infant with a higher exposure to PCB showed a 6 point lower IQ level. Joseph L. Jacobson and Sandra W. Jacobson, *Intellectual Impairment in Children Exposed to Polychlorinated Biphenyls In Utero*, 335 New England Journal of Medicine 783 (1996). Rodgers found this very important. Rodgers Tr.Tr., pp. 41–44.

7. Walter J. Rogan and Beth C. Gladen, *Study of Human Lactation for Effects of Environmental Contaminants; The North Carolina Breast Milk and Formula Project and Some Other Ideas*, 60 Environmental Health Perspectives 215 (1985). He looked at 900 random women and classified them by the amount of PCB's in their breast milk. These are people with no known actual exposure to PCB. The study found that highly exposed infants in the first few months of life were very hypotonic. Rodgers Tr.Tr., pp. 44–45.

Dr. Rodgers reviewed the report of Dr. Wesley Birge. After reviewing Dr. Birge's report Rodgers gave an opinion that

"exposure to PCB's poses a significant health risk to people .... Those effects are probably proportionate to exposure. I think that particularly for cancer risk, the assumptions in doing cancer risk assessment are that any exposure gives you some increased risk, that risk is essentially proportionate to the amount of your exposure down to zero. There isn't any point where the risk stops. The lower your exposure, the lower your risk."

Rodgers Tr.Tr., p. 56. His opinion is that persons who live in this environment "increase the risk of those things [getting cancer] happening." Rodgers Tr.Tr., p. 57.

Dr. Rodgers was asked to state to a reasonable degree of certainty as to whether the levels of PCB's on the properties posed a significant health risk. He responded

I think the two most important environmental components are probably the soil and sediment levels, and the fish levels. Certainly, if you are eating fish, it is very

important. Perhaps nobody is eating fish in the Mud River any more. I don't know. I think those pose health risk problems.... I think this river is still contaminated with PCB's. It is contaminated at the upper end. It is contaminated at the lower end. But I think the exposure and the absence of some measures to remediate it, will continue. It imposes a health risk, yes.

Rodgers Tr.Tr., pp. 59–60. Dr. Rodgers continued by saying that as a physician his advice would be to avoid the risk. Rodgers Tr.Tr., p. 61. As to the extent of exposure which may be harmful, Dr. Rodgers said:

And your comment, or your statement that the dose makes the poison is basically a true statement. I think that, as I pointed out before, the more you get, the more risk. The argument becomes with some chemicals and some toxic effects is there's some level below which you don't get any effect. I think the consensus for cancer effects is that that's not true, that probably down all the way to zero any you get increases your risk.

Rodgers Tr.Tr., p. 63. Dr. Rodgers did state within a reasonable degree of medical certainty that the level of PCB's on the property posed a significant health risk. Rodgers Tr. Tr., p. 63.

Dr. Rodgers said that he did not need to know the specific PCB levels on each property to conclude that exposure in any fashion caused a risk. Rodgers Tr.Tr., p. 77. The biggest route of exposure is through fish. Rodgers Tr.Tr., p. 78. Rodgers based his testimony upon Birge's water data and the 1986 fish studies. He looked at no recent fish studies. Rodgers Tr.Tr., p. 83.[9]

He did not perform a quantitative risk assessment. Rodgers Tr.Tr., pp. 99–100. In other words, he did not attempt to quantify the risk based upon the exposure of particular properties or individuals. Rodgers Tr. Tr., p. 101. He has not determined whether the risk from PCB's exceeded a negligible risk. Rodgers Tr.Tr., pp. 101–102.[10] Rodgers did say, "What I can tell you is that based on how I assess their potentials for exposure in this environment, they have a larger potential for exposure than the background population." Rodgers Tr.Tr., p. 102. Rodgers said that he did not know a value which was a negligible risk. Rodgers Tr.Tr., p. 103.

On cross-examination, counsel engaged in lengthy questioning about the meaning of EPA and ATSDR designations for PCB's. Among other things, Dr. Rodgers responded in an interesting way: "What I have said is that I personally think that PCB's are carcinogens .... I think there is a causation ... that's based on things beyond those studies." Rodgers Tr.Tr., p. 119.

Rodgers says that you cannot make a conclusion that something is a carcinogen based on one study, but rather must look at the weight of all the evidence. Rodgers Tr.Tr., p. 125. Defendant questioned Rodgers about ATSDR's conclusion that "studies of PCB exposed workers provide inconclusive evidence of exposure related cancer." Rodgers Tr.Tr., p. 127. Rodgers disagrees with the ATSDR conclusion. He says that the weight of the scientific evidence is that the compounds are human carcinogens. Rodgers Tr. Tr., p. 128. He says that evidence is inadequate at this time to make a definitive statement in the eyes of the ATSDR or the EPA that PCB's are human carcinogens. Regarding immune system function Rodgers says that he thinks the evidence in animals is conclusive and that in humans it is probably inconclusive. Rodgers Tr.Tr., p. 129.

On rebuttal Rodgers pointed out that five or six human studies discussed evidence of cancer in people exposed to PCB's. Rodgers pointed out that none of the studies was perfect. Rodgers gave the opinion that the studies have found evidence of association

---

**9.** Dr. Rodgers did not consider any of the fish data from 1995–1997. For those fish collected in the Lower Mud River, a total of 89 fish fillets were analyzed. It is undisputed that not a single one of these samples revealed a PCB level which exceeded the FDA action level of 2 ppm. That is the level at which the FDA has ruled that it is safe to sell or consume fish. Rodgers Tr.Tr., pp. 84–88.

**10.** The EPA has apparently defined a negligible risk as one which is less than one in a million excess cancer.

between PCB exposure and different kinds of cancer. Rodgers, Trial Transcript Rebuttal ("TTR"), p. 5. Rodgers also says that simply because the studies found different kinds of cancer possibly associated with PCB's does not make them all invalid. Dr. Rodgers reiterated his interpretation of the data that PCB's are human carcinogens. Rodgers TTR, pp. 6–7. He conveyed his opinions about how PCB's cause or promote cancer. Rodgers TTR, pp. 7–8. Rodgers confirmed that as to PCB's carcinogenic effect, he disagrees with all the other witnesses as well as all known scientific summaries, including ATSDR and EPA. Rodgers TTR, pp. 13–15. Dr. Rodgers is the only one of all the witnesses or groups who is convinced that PCB's cause cancer.

V.

The Supreme Court granted certiorari in *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), to consider the standard ordinarily applicable to the review of evidentiary rulings of a district court. Defendant says that the Supreme Court's holding and other conclusions require this Court to dismiss Plaintiffs' claims here. For the reasons stated, the Court believes that *Joiner* is instructive and helpful, but that neither its holding nor its analysis mandates a particular result in this case.

Joiner claimed that his workplace exposure to PCB's caused or promoted his development of small-cell lung cancer. During the discovery stage, Joiner produced two expert witnesses who testified that PCB's, furans and dioxins can promote cancer and that Joiner's exposure to them likely was responsible for his cancer. The district court considering defendant's motion for summary judgment, found that (1) Joiner presented sufficient evidence that he was exposed to PCB's, (2) there was insufficient evidence of exposure to furans and dioxins, (3) the expert testimony about a link between PCB's and cancer did not rise above "subjective belief or unsupported speculation." *Id.* at 516.

The Eleventh Circuit, applying a particularly stringent standard of review, reversed the district court's exclusion of the expert testimony. The Supreme Court found that the proper standard of review was one of abuse of discretion. Applying this less stringent standard, the Supreme Court concluded that the district court did not abuse its discretion by excluding the expert testimony.

The question remains whether *Joiner* contains any special lessons for this Court. In *Joiner*, the plaintiff relied upon the testimony of two physicians, who opined that Plaintiff's exposure to PCB'S promoted his then-existing cancer. Together they relied upon four epidemiological studies as well as animal studies in support of their opinions. The district court concluded that the animal studies did not provide a sufficient scientific basis for concluding that PCB's can cause cancer. In our case Plaintiff does not base his opinion upon animal studies.

The real focus of both cases is upon the reported studies of industrial accidents or other occupational exposure to PCB's. The studies relied upon the *Joiner* case are different, for the most part, than those mentioned by Dr. Rodgers. Moreover, the experts in each case sought to advance different propositions. In *Joiner*, the experts sought only to suggest a relationship between a known exposure to PCB's and an already existing harm (cancer). The district court believed the significant evidence insufficient to make even this direct connection. In our case, Rodgers sought to suggest a relationship between a limited exposure of PCB's on property, an unknown exposure to people who might purchase the property and an unknown and projected harm. Thus, Rodgers attempts to advance a proposition which is much more speculative on its face than that advanced in *Joiner*.

As the Supreme Court found, a district court may properly consider whether there is simply too great an analytic gap between data and the opinion proffered. *See id.* at 519. That analytic gap is far greater in our case than the gap in *Joiner*, if for no other reason than that the opinion itself is so much more speculative. The reason is that the evidence in this case as to the essential legal elements is much less compelling than that presented in *Joiner*. Because the analytic gap between data and the opinion proffered

is so great, the Court concludes that it is well within the Court's discretion to dismiss the case. However, the Court might reach that conclusion only after a careful analysis of the evidence.

## VI.

■ With any negligence action, Plaintiffs must prove duty, breach, cause and injury. As already noted, the Court found that as a matter of law Defendant breached its duty of due care. That leaves two issues for Plaintiffs to prove: cause and injury.

The first step in proving that Defendant's breach caused them an injury is to show that the PCB's on their property came from Defendant's facility. In fact, there is ample evidence in this case, all essentially unrefuted by Plaintiffs, that PCB's are ubiquitous and one expects to find certain background levels of PCB's on all property. Plaintiffs must have proof that the levels of PCB's on their property now are greater than background levels in order to conclude that through its negligence Defendant deposited the PCB's on Plaintiffs' properties.

Certainly Plaintiffs can understand the importance of such evidence. Their property is located fifty river miles away from the Rockwell facility and their property is not on the branch which was initially contaminated. The PCB's would have had to travel a long and indirect route in order to reach Plaintiffs property. Since Dr. Birge admitted that PCB's usually hang around the actual source of contamination, Plaintiffs have a difficult burden in showing that the PCB's on their property came from Defendant's facility. Plaintiffs' burden is not insurmountable. If the contamination on Plaintiffs' properties is measurably higher than what one would normally expect to find on property and there was no other source of contamination, then one could easily infer that Defendants deposited PCB's onto Plaintiffs property. Plaintiffs have no proof precisely to this point.[11]

The actual proof presented on this is minimal. Dr. Birge testified that in 1994 he found .14 ppm on the Croxton property and

this number was almost doubled in 1997 to the amount of .27 ppm. However, on the Smith property he determined that the PCB levels decreased between 1994 and 1997. In 1994 the PCB's amounted to .20 ppm and in 1997 the PCB's measured .12 ppm. On the Morgan property the PCB's increased from .04 ppm in 1994 to .07 ppm in 1997. Dr. Birge did not do a comparison on the Wilson property he just did one reading and found that there were PCB's on the property in the amount of .16 ppm. The most significant finding of Dr. Birge's (and significance is relative) was that the Cooke property had .37 ppm PCB's on it in 1997 whereas in 1994 it only had .08 ppm. Dr. Birge said that he could find no other source for the PCB's than the Defendant's facility.

Nevertheless, Dr. Birge seems to have made no attempt to reconcile these numbers with evidence that one would expect to find small amounts of PCB's on any property. Had the actual amounts been large or had Plaintiffs' property been closer to the facility, then his omission would not be as conspicuous. However, Plaintiffs have chosen to pursue a claim for minute amounts of PCB's. With that decision comes the burden of proving that minute changes are significant. Plaintiffs offered no proof that even the low amount of PCB's found on their properties are more than one would expect. Nonetheless, Dr. Birge did testify that he could find no other source for the PCB's. Thus, he concluded that the PCB's could have originated only from Defendant's facility. He also presented evidence that PCB's could travel the required distance to Plaintiffs' property. Based on this testimony, a reasonable jury could believe Defendant's negligence caused all the PCB's to be on Plaintiffs' property.

Yet, even accepting Dr. Birge's thesis, Plaintiffs still have not shown that the amounts deposited are greater than background levels. Thus, Plaintiffs have not proven that the amounts are more than what any buyer could expect to find on any other

---

11. While Defendant cannot prove that these PCB's are not from its plant, it does present evidence that the PCB levels here are less than what Defendant contends are normal "background" levels.

piece of property. Such a failure may be fatal because that means there is no evidence that these amounts of PCB's caused their fair market value to decrease. For example, if all property is believed to have background levels of PCB's, then all property is valued accordingly, including Plaintiffs. Based upon Plaintiffs' evidence one must conclude that publicity surrounding Defendant's negligence and the public's sudden awareness and fear of PCB's in general, rather than the actual presence of PCB's in excessive amounts, caused the fair market value to decline.

In any event, assuming one reasonably believed that Rockwell's PCB's migrated to these properties and that there were more than background levels of PCB's, Plaintiff must prove more than mere presence. Plaintiffs must prove that the PCB's harmed their property. The only way Plaintiffs can show harm is to show that PCB's in these amounts are a health hazard.

The amounts of PCB's which Dr. Birge has found on these properties are incredibly low. The range is between .37 ppm to .04 ppm. On many of the nearby properties he found no PCB's.[12] More important for our purposes, no witness in this case has said that the levels of PCB's on these properties are greater than properties elsewhere. No one has even attempted to quantify the degree of risk or the increase of a risk based upon these low levels of PCB's. According to Dr. Rodgers none of this matters.

A basic summary of Rodgers testimony is that even a small amount of PCB's is a health hazard because any additional exposure to PCB's increases one's risk of cancer. Dr. Rodgers made no attempt to quantify any particular property's dangerousness. He merely stated that if there are additional PCB's on these properties, then there is an additional risk to health. Dr. Rodgers also said that there is a significant risk of health problems for people eating the fish from the river. The amount of PCB's in the fish, he says, if consumed regularly, are dangerous.

The Court finds this testimony simply insufficient to prove an actual harm to any piece of property. First, the testimony regarding the dangers associated with the fish is irrelevant to determining whether the amounts of PCB's on Plaintiffs' properties are hazardous. The fish are not part of the property. Moreover, there is no evidence that any fish near these properties are contaminated above FDA approved levels. Thus, Dr. Rodgers' opinion—at least an important part of it—is based upon evidence which does not exist.

Second, testimony that any additional exposure—even at low levels—equals additional risk is simply not supported by scientific evidence. Indeed, after the last *Daubert* hearing the Court concluded that no human or animal studies demonstrate that such low levels of exposure increase one's risk of cancer or other diseases. The Court believed then, as it does now, that "proof of more than such limited exposure must be required, unless the hazardous substance is demonstrated to cause injury or disease even in small doses." Dr. Rodgers has done no independent research on this subject. Dr. Rodgers' testimony that any increase in exposure increases the risk of disease is in essence the very same opinion which the Court previously excluded. Plaintiffs still have not shown that exposure to very small doses of PCB's causes cancer.

In any event, to opine that every molecule of exposure to PCB's increases one's risk would not be sufficient to support Plaintiffs' case. Dr. Rodgers cites no scientific study or research to support his personal opinion. Rodgers neither acknowledges nor deals with this in a scientific manner. This Court ruled before the trial that Rodgers' opinion that one molecule of PCB's increases the risk of cancer would not be admissible because that opinion has no scientific basis whatsoever. Likewise, there is no scientific basis for Rodgers' slightly finessed opinion that "any

---

**12.** To put this in some context, the most stringent standard of the Kentucky Department of Natural Resources for flood plain clean-up level applicable to all uses is 0.1 ppm PCB's. At this level the Department believes that the risk of cancer is *de minimus*. The EPA's most recent standard for a *de minimus* risk is 1.0 ppm PCB's. All of these properties fall well below the EPA standard; four out of six fell below the Kentucky standard or within a fraction of the state standard. This is not a regulatory case, so the remediation standards are not relevant.

additional exposure increases risk." Therefore a jury could not reasonably rely upon this portion of his opinion to reach a Plaintiffs' verdict.

Furthermore, other than saying that additional risk existed, Dr. Rodgers provided no evidence that the risk changed in any measurable way or to what extent it changed. Dr. Rodgers could not even say the risk was anything more or less than negligible—more or less than 1 in 1,000,000. In fact, he would not acknowledge the existence of a negligible risk of PCB exposure. If the hazard posed by exposure to this property before the PCB deposits was a 1 in 1,000,000 chance of getting cancer and the risk after the deposits is still 1 in 1,000,000, then there has been no harm to the property because it is not more hazardous now than it was before the contamination.

In the end, Dr. Rodgers' opinion is highly personal. The opinion amounts to little more than a strongly held and fervently stated belief. He cannot substantiate that opinion either by scientific literature or believable facts. Thus, the gap between his beliefs and the scientific literature and the facts here are incredibly wide. So wide that the Court cannot allow the jury to decide the case on this evidence.

The Court does not doubt for a moment that the fear and uncertainty about PCB's is so great that some persons will not want to remain on these properties. For the same reasons, some may not want to purchase the properties. Given that so little is known and so much fear exists, this is not at all surprising. The Court does not believe that Kentucky courts would allow such a fear, even though it has a certain unscientific logic, to be the basis of this lawsuit. The Court cannot find any scientific basis for such fears at these levels of PCB's.

The strongest argument and concern which has weighed against dismissal is that having allowed the case to go forward for so long that it may now be only fair to allow a jury to give these Plaintiffs their verdict. The Court has done that, however. If the evidence was even close to what a reasonable jury might find persuasive, the Court would let this case go forward. It is not. Now,

Defendant has a right to have that very evidence judged dispassionately. That it would be better to have a jury dismiss this case rather than a judge is undeniable. That it would be a waste of jurors' time to hear this evidence again is equally clear.

## VII.

The Court has also reviewed Plaintiff's evidence of the loss of fair market value of these properties. In its motion for directed verdict immediately after trial, Defendant strenuously attacked the evidentiary foundation of Plaintiffs' damage proof. It does so again in this latest motion, raising the same issues based on the record. Due to the Court's decision in Section VI, the Court need no longer detail its review and conclusions as to the damage issue. However, the review which it has completed leads the Court to conclude that Plaintiffs' damage proof was fatally flawed as well.

In its last memorandum and order, the Court acknowledged the persuasiveness of Defendant's arguments. As to the absence of a proper survey of comparable properties, the Court stated:

> In this case, Mr. Graham's conclusion seems to be based upon less than a thorough survey of the comparable properties. However, the Court concludes that the testimony is based upon sufficiently objective factors to have probative value for the jury.

As to the charge that Mr. Graham improperly added up separate valuation of land and improvements, the Court stated:

> Therefore, Defendant is right in asserting that it is improper to add up the various market values of separate parts of the estate, but the rule is not a bright line test. As these cases suggest, it is proper to consider the various enhancements of market value, and if the market value estimate is not solely based on improper additions and the testimony as a whole demonstrates a basis for the testimony, then the witness testimony will support a verdict. The Court concludes that Mr. Graham did not rely solely on separate valuations of land so as to make his testimony inadmissible.

As to the charge that Mr. Graham improperly relied upon forced sales, the Court stated:

> In this case, there is no doubt that the "Gardner to Gardner" sale occurred under circumstances which demonstrate its unreliability of determining fair market value. First, the sale occurred under forced conditions as a result of threatened or actual foreclosure. Second, the sale occurred between family members whose objective was not necessarily to obtain the highest price for the Mud River property. Third, the sales price was allocated between various properties and there is no evidence that the allocation reflected the appropriate values of the properties. From the evidence, it appears that the seller needed to raise a certain amount of cash from both properties combined and had no need to require his relatives to pay any more. There was no need to allocate the sales price between the properties in an accurate manner.
>
> Under these circumstances, Plaintiff must present some evidence that the sale was "arm's length" and reflects a fair market value transaction. Graham provided some limited information from which a jury could bolster the reliability of the transaction. The Court will advise the jury that before relying upon the "Gardner" transaction it must believe that the transaction was one "at arm's length."

After reviewing the trial transcript the inadequacies of Mr. Graham's testimony became clearer. The primary difficulty is dealing with the many inconsistent and seemingly altered opinions throughout the testimony. This could lead to the conclusion that the jury should resolve these discrepancies.

Mr. Graham based his bottom land valuation upon a single transaction, that being the "Gardner to Gardner" sale. After reviewing the record, the Court agrees completely with all its previously stated reasons why this transaction is unreliable. Mr. Graham added nothing in his testimony which in any way challenges the Court's conclusions that the sale occurred under forced conditions, that the sale occurred between family members whose objective was not necessarily to obtain the highest price and that the allocation of the price among various properties was not clear. In fact, upon reviewing the testimony, the Court cannot find any basis in the record for bolstering the reliability of this transaction. Certainly there is no reason to believe that the transaction was one at arm's length. Thus, there is no basis for believing the transaction represented a fair or real market price for the property.

The Court can find no other testimony in the record to substantiate Mr. Graham's opinion of $185 per acre bottom land valuation. In fact, the testimony cited by Defendant suggests that whatever the valuation might be, it is much, much higher.

On rebuttal, Mr. Graham tried to bolster his bottom land valuation opinion based on the "Gardner to Gardner" sale, rather than by pointing out other sales which might substantiate his opinion. However, upon reviewing this rebuttal testimony, the Court finds that it is completely inadequate to bolster the credibility of the "Gardner to Gardner" sale. Mr. Graham must do something more than simply assert his opinion that the transaction represents an arm's length fair market value transaction. Because so much of the evidence suggests that it was neither arm's length nor fair market value transaction, Mr. Graham must come forward with actual evidence to the contrary. He has come forward with nothing more than an opinion.

The other aspect of Mr. Graham's opinion which becomes untenable upon review of the transcript is his conclusion that the upland value of Plaintiffs' property is reduced by 50 percent as a result of its connection with the contaminated bottom land. Although the record is confusing, Mr. Graham seems to cite four sales, identified as Nos. 44, 55, 56 and 57, as evidence that upland properties associated with adjoining contaminated bottom land suffered a significant reduction in value. A review of those four sales, reveals that they simply do not establish the proposition which Mr. Graham ultimately advances. Sales No. 44, 55 and 57 either have nothing to do with the Mud River or do not in any way establish a reduction in value due to the association with contaminated bottom land. From the transcript, it appears that even Mr. Graham acknowledges this. From the cross-

examination, Mr. Graham seems to acknowledge that Sale No. 56 does not establish any basis for concluding that its value reduced due to an association with contaminated bottom land.

The parties have argued about whether Mr. Graham's testimony is based upon an improper adding up of various market values of separate parts of the properties or whether Mr. Graham is really valuing the properties as a whole, and merely considering various market value enhancements or decreases to inform that process. The answer to that question seems unimportant to the ultimate issue. No doubt Mr. Graham relied upon these comparable properties in some significant way. Unfortunately, due to the reasons described, Mr. Graham's comparables or comparisons are so badly compromised that they provide very little basis upon which a jury might believe the opinion he advances. The Court need not follow through on the analysis to determine whether it presents an independent basis for dismissing this case.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court has considered Defendant's motion for judgment as a matter of law and has filed a Memorandum Opinion explaining its analysis of the law and evidence relevant to this case. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for judgment as a matter of law is SUSTAINED; Plaintiffs' complaint and the remaining claims contained therein are DISMISSED WITH PREJUDICE.

This is a final judgment and there is no just reason for delay.